U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

# UNITED STATES DISTRICT COURT

2020 JUL 21   AM 11: 03

## DISTRICT OF VERMONT

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| ALLCO FINANCE LIMITED, OTTER CREEK SOLAR LLC, and PLH VINEYARD SKY LLC | Case No. 2: 20-cv-103 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| ANTHONY ROISMAN, SARAH HOFMANN and MARGARET CHENEY, in their official capacities as commissioners of the Vermont Public Utility Commission. | |
| Defendants. | |

## NATURE OF THE ACTION

1.     This case concerns the legality of the refusal of the Defendants' procuring agent, VEPP Inc., a state-created entity ("VEPP"), to execute written contracts for the purchase of electricity from small solar electricity generating facilities owned by the plaintiffs (collectively, "Allco") under Vermont's standard offer program (the "Standard Offer"). *See*, 30 V.S.A. § 8005a. Under Vermont's Standard Offer program, VEPP acts as a purchasing agent on behalf of Vermont's electric utilities.

2.     In 2019 and 2020, Allco committed to provide electricity to VEPP for a 25-year period at rates and under standard contract terms approved by the Vermont Public Utility Commission ("VPUC"). By unconditionally committing to sell their output to VEPP on those standard terms, Allco created a "Legally Enforceable Obligation" ("LEO") under section 210 of the Public Utility Regulatory Policies Act, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA"), requiring VEPP to purchase all output from Allco's facilities. *Windham Solar LLC*, 157 FERC ¶ 61,134 (2016).

1

3.      VEPP would have executed the contracts for Allco's facilities but for a quantitative cap on the amount of contracts the VPUC has imposed on VEPP.   VEPP would have also executed at least some of the contracts for Allco's facilities if it were not for an unlawful pricing mechanism that the VPUC has imposed through a series of orders that ranks how the contract capacity made available is distributed, and what price is available.

4.      Last year in a substantially similar case brought by an Allco affiliate, the Court of Appeals for the Ninth Circuit held that quantitative caps and the use of a pricing mechanism that requires bidders to bid against each other (as the VPUC's orders impose) violates PURPA. *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980 (N.D. Cal. 2017) (Donato, J.) *aff'd sub nom., Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019) ("*Winding Creek*"). *See, id.*, 932 F.3d at 865 (a "cap on the amount of energy utilities must purchase from QFs is impermissible under PURPA's must-take provision. [With a cap], a utility could purchase less energy than a QF makes available, an outcome forbidden by PURPA.").[1]

5.      This complaint is brought under section 210(h) of PURPA, 16 U.S.C. § 824a-3(h). Plaintiffs satisfied the administrative exhaustion requirement by first asking the Federal Energy Regulatory Commission ("FERC") to bring an action against the VPUC.  FERC issued its notice of intent not to act on January 3, 2017, which declined to initiate its own enforcement action against the VPUC under section 210(h)(2)(a) but authorized plaintiffs to proceed in federal district court. *Otter Creek Solar LLC*, 158 FERC ¶ 61,001 (2017).

---

[1] "[Q]ualifying small power production facilit[ies]" under the statute and "Qualifying Facilities" or QFs under FERC's regulations, *see* 16 U.S.C. § 796(17)(C); 18 C.F.R. § 292.203).

**STATEMENT OF FACTS**

**I.      Statutory and Regulatory Framework.**

    **A.      Congress Enacts PURPA to Incentivize Renewable Power Development.**

       6.      PURPA was enacted as part of the National Energy Act of 1978 as part of the United States' response to the repeated energy crises of the 1970s.  President Carter called that response "the Moral Equivalent of War."[2]  During deliberations on the National Energy Act, Frank Press, the science advisor to President Carter observed prophetically:

> Fossil fuel combustion has increased at an exponential rate over the last 100 years. As a result, the atmospheric concentration of $CO_2$ is now 12 percent above the pre-industrial revolution level and may grow 1.5 to 2.0 times that level within 60 years. Because of the greenhouse effect of atmospheric $CO_2$, the increased concentration will induce a global climatic warming of anywhere from 0.5° to 5° C. . .. The urgency of the problem derives from our inability to shift rapidly to non-fossil fuel sources once the climatic effects become evident not long after the year 2000; the situation could grow out of control before alternate energy sources and other remedial actions become effective.[3]

       7.      PURPA is even more relevant today.  Last November, a new report by 11,258 scientists in 153 countries from a broad range of disciplines warned that the planet "clearly and unequivocally faces a climate emergency."[4]  Making matters worse, the current pandemic and resulting global public health crisis have shined a spotlight on the human health toll of fossil fuel generation.  A recent study by the T.H. Chan School of Public Health at Harvard University concludes: "A small increase in long-term exposure to [fossil fuel pollutant] PM 2.5 leads to a

---

[2]  Speech of President Jimmy Carter, April 18, 1977.  *See New York Times*, https://www.nytimes.com/1977/04/20/archives/moral-equivalent-of-war.html.
[3]  Memorandum from Frank Press to the President, Release of Fossil $CO_2$ and the Possibility of Catastrophic Climate Change (July 7, 1977) available at https://www.jimmycarterlibrary.gov/digital_library/sso/148878/31/SSO_148878_031_07.pdf at 6.
[4]  "*More than 11,000 scientists from around the world declare a 'climate emergency.'*" *Washington Post*, November 5, 2019, https://www.washingtonpost.com/science/2019/11/05/more-than-scientists-around-world-declare-climate-emergency/.

large        increase        in        the        COVID-19        death        rate."
https://www.medrxiv.org/content/10.1101/2020.04.05.20054502v2.[5]

8.      PURPA remains the only federal law requiring utilities to purchase renewable energy; hence, PURPA "was and remains a primary incentive for renewable power development." Steven Ferrey et al., *Fire and Ice: World Renewable Energy and Carbon Control Mechanisms Confront Constitutional Barriers*, 20 Duke Envtl. L. & Pol'y F. 125, 140 (2010).

9.      Vermont consumes almost four times as much energy as it produces, but total energy consumption is the smallest of all the states. https://www.eia.gov/state/?sid=VT. The Energy Information Administration estimates that in 2017 Vermont produced approximately 38 trillion BTUs in-state. Total consumption was approximately 135 trillion BTUs. Where does that excess of 97 trillion BTUs come from? The largest source is from fossil fuel generation, which is a silent killer of the environment and people.

10.      The energy from fossil fuels that Vermont chooses to consume rather than building the necessary solar energy facilities within its borders and comply with federal law also causes a raft of other health issues that span generations and that disproportionately affect the poorest communities. The fossil fueled Mystic Generating Station in Massachusetts is one such power plant that supplies electricity to the ISO-New England region from which Vermont gets its electricity. Last month, the Boston Globe reported on the generational suffering that families like Sean Collie's have endured and still endure from Vermonters and New Englanders flipping on the light switch. *See*, https://www.bostonglobe.com/2020/06/14/metro/effort-keep-states-largest-power-plant-open-fuels-concern-about-climate-public-health/ ("The towering smokestacks of the state's largest power plant have loomed for decades over the Boston area, spewing pollutants that

---

[5] PM 2.5 particulate matter is pumped into the air by fossil fuel plants. PM 2.5 particulate matter is 2.5 micrometers or less. The width of an average human hair is 30 times larger than a PM 2.5 particle.

produce smog, warm the planet, and exacerbate asthma and other respiratory illnesses, such as the coronavirus. ... Sean Collie, who has lived a few blocks from the Mystic plant for 23 years ...suffers from asthma, as does his 12-year-old daughter. Collie, whose wife gave birth last year to another daughter, worries for his growing family. The air in the neighborhood can be so difficult to breathe that they sometimes have to shut all their windows. The foul-smelling fumes often leave him wheezing, and prone to long spells of coughing.")

11.     PURPA was enacted to overcome the reluctance of traditional electric utilities to purchase power from and to sell power to non-traditional facilities like Allco's. *Winding Creek*, 932 F.3d at 863 (citing *Indep. Energy Producers Ass'n, Inc. v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 850 (9th Cir. 1994)).   PURPA addressed that problem by requiring electric utilities to purchase power from "qualifying small power production facilities," 16 U.S.C. § 824a-3(a), which include facilities designed to produce electricity solely through the use of a renewable fuel source, such as Allco's facilities. *Winding Creek*, 932 F.3d at 863;  *see also FERC v. Mississippi,* 456 U.S. 742, 760-761, 102 S. Ct. 2126, 72 L. Ed. 2d 532 (1982) ("The statute's substantive provisions require electricity utilities to purchase electricity from, and to sell it to, qualifying cogenerator and small power production facilities."); *Great Divide Wind Farm 2 LLC v. Aguilar,* 405 F. Supp. 3d 1071, 1087-90 (D.N.M. 2019).

12.     Under section 210(a) through (e), 16 U.S.C. § 824a-3(a)-(e), FERC is required to adopt rules governing implementation of PURPA's must-purchase obligation, and to define methods for calculating the avoided-cost rates at which such purchases must occur.  Under section 210(f), 16 U.S.C. § 824a-3(f), states are required to enforce PURPA against the utilities they regulate in accordance with the implementation rules adopted by FERC.[6]

---

[6] On July 16, 2020, the FERC issued Order No. 872, 172 FERC ¶ 61,041 (2020), which is a final rule that revises the FERC's regulations under section 210 of PURPA.  The changes made by the Order No. 872, if they survive legal challenges, are prospective only and do not affect plaintiffs'

13.     The statute also creates a specific structure for enforcement, divided between federal and state courts. PURPA section 210(h)(2), on the one hand, authorizes challenges to state implementation schemes that violate PURPA and FERC's implementation rules, which the courts have generally referred to as "implementation" challenges. *See Great Divide Wind,* 405 F. Supp. 3d at 1091-93. Specifically, as here, an aggrieved party may file a complaint with FERC and, if FERC does not act within sixty days to bring its own enforcement action against the state, the aggrieved party is then authorized to challenge the state's actions in federal district court. 16 U.S.C. § 823a-3(h)(2).

14.     Section 210(g), on the other hand, governs what the courts have generally termed "as applied" challenges. Section 210(g)(2) authorizes "[a]ny person" to bring an action in state court "against any electric utility" to "enforce any requirement established by a state regulatory authority" which includes the VPUC, the Vermont Legislature and the state of Vermont itself. 16 U.S.C. § 823a-3(g)(2). *See Great Divide Wind Farm,* 405 F. Supp. 3d at 1093-96.

**B.     FERC Adopts Rules Setting Requirements for States to Implement PURPA.**

15.     To carry out the statute's directive, FERC enacted regulations requiring that "[e]ach electric utility shall purchase . . . any energy and capacity which is made available from a qualifying facility . . . [d]irectly to the electric utility." 18 C.F.R. § 292.303(a). A utility's obligation to purchase all output from a qualifying facility is known as a "legally enforceable obligation," or as the Ninth Circuit describes it—PURPA's "must-take" obligation. *See Winding Creek*, 932 F.3d at 865. Once the utility's LEO or "must-take" obligation is triggered, the utility becomes bound to purchase all electricity the qualifying facility produces. *See Order 69,* Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the

---

rights complained of herein. *See* Order No. 872, 172 FERC ¶ 61,041 at ¶66 (July 16, 2020) available at: https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20200716-3109.

Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214 at 57 (Feb. 25, 1980) (A legally enforceable obligation is created when "*the qualifying facility has agreed to obligate itself to deliver at a future date energy and capacity to the electric utility.*") (emphasis supplied).[7]  The LEO concept has been a cornerstone of PURPA since enactment. *See FLS Energy, Inc.*, 157 FERC ¶ 61,211, at P24 (2016) ("The Commission has explained that the term 'legally enforceable obligation' is broader than simply a contract between an electric utility and a QF, and that a state may not limit the methods through which a legally enforceable obligation may be created to only a fully executed contract. . ..  The Commission explained in *JD Wind 1 LLC*, 130 FERC ¶ 61,127 (2010), that *the establishment of a legally enforceable obligation turns on the QF's commitment, and not the utility's actions*[.]") (emphasis added) (footnote omitted).

### C.    FERC Sets Forth How to Establish Avoided Costs.

16.    PURPA also directs FERC to promulgate rules ensuring that "in requiring any electric utility to offer to purchase electric energy from any . . . qualifying small power production facility, the rates for such purchase" shall not "exceed[] the incremental cost to the electric utility of alternative electric energy."  16 U.S.C. § 824a-3(b).  FERC's regulations carrying out that directive provide that "[r]ates for purchases from new capacity" – that is, from facilities constructed after PURPA's enactment, § 292.304(b)(1) – must be equal to, and not less than, the utility's avoided costs. *Id.* § 292.304(b)(4).

17.    FERC's regulations also detail the methodologies that must be used in determining a utility's avoided costs and provide that the QF has the option to choose which of two methodologies shall be used in calculating the utility's avoided costs. *Id.* § 292.304(d).  When a qualifying facility provides "energy or capacity pursuant to a legally enforceable obligation for the

---

[7]  Available at https://www.ferc.gov/sites/default/files/2020-04/order-69-and-erratum.pdf (last visited July 19, 2020).

delivery of energy or capacity over a specified term, . . . the rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, be based on either: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.* § 292.304(d)(2) (emphasis added).

18.     The first methodology – "[t]he avoided costs calculated at the time of delivery," *id.* § 292.304(d)(2)(i) – is known in the industry as a "short run avoided cost" ("SRAC") rate, because it can be determined only at the moment that electricity is delivered. Typically, SRAC is calculated on a month-to-month basis and depends in part upon the fluctuating market price of natural gas or coal. The second methodology – "[t]he avoided costs calculated at the time the obligation is incurred," *id.* § 292.304(d)(2)(ii) – is known in the industry as a "long run avoided cost" ("LRAC") rate because it is determined at the time the utility incurs the purchase obligation and is determined for the entire duration of the contract term. A utility's LRAC is typically calculated through the use of a mathematical model that projects the utility's anticipated avoided costs in the future.

19.     Both the "must-take" obligation and avoided-cost rates are federal obligations which can be enforced in state court under section 210(g) of PURPA. 16 U.S.C. §824a-3(g)(2); *FERC v. Mississippi,* 456 U.S. at 760 ("state courts have a unique role in enforcing the body of federal law, . . . the state courts [are] directed to heed the constitutional command that the policy of *the federal Act is the prevailing policy in every state* [] and should be respected accordingly in the courts of the State") (internal citations and quotations omitted) (emphasis added).

**D.  Vermont's Implementation of PURPA.**

20.     FERC's PURPA rules, including the requirement that utilities and their purchasing agent honor any LEO to purchase power from a QF, are the baseline PURPA requirements in every state, and require Vermont to enforce those obligations against the utilities it regulates. *FERC v. Mississippi,* 456 U.S. at 760 ("the policy of the federal Act is the prevailing policy in every state.")

21.     The VPUC oversees two types of interstate wholesale electricity programs with a QF—Vermont's Standard Offer program, which is at issue here, *see*, 30 V.S.A. § 8005a, and VPUC Rule 4.100, which is entitled Small Power Production and Cogeneration.

22.     In 2009 the Vermont Legislature enacted 30 V.S.A. § 8005a establishing the Standard Offer program under which contracts would be issued to renewable energy QF generators for the purchase of electricity from renewable energy projects.  The Standard Offer program requires VEPP to enter into long-term fixed rate contracts for the purchase of electricity and environmental attributes from renewable energy generators that are sized 2.2 megawatts ("MWs") or smaller, except a larger limit of 5MWs applies to hydroelectric facilities.  In the case of solar energy facilities, the contract term would be twenty-five years.

23.     Like any utility-type generation project, a small solar QF requires a fixed and predictable stream of income in order to finance construction.   When first implemented, the price paid for each kilo-watt hour ("kwh") of electricity under the Standard Offer program was set administratively by the VPUC.  The program had an initial capacity of 50MWs.  That capacity was quickly oversubscribed.

24.     In 2012, the Standard Offer capacity was expanded to 127.5 MWs for certain QFs, and was uncapped for other QFs.  The contracts representing the additional 77.5MWs would be given out over a period of 10 years.  The number of contracts that would be issued each year would be capped, initially at 5MWs per year, then 7.5MWs, and finally at 10MWs.

25.     Section 8005a(f)(3) also added in 2012 instructed that, no later than March 1, 2013, for effect on April 1, 2013, the VPUC must develop standard-offer prices based on an avoided-cost methodology. This provision also directs the VPUC to implement a market-based pricing mechanism applicable to QFs covered by the cap, if the VPUC finds the market-based mechanism to be consistent with federal law and the legislative goal of rapid deployment of new renewable

resources at the lowest feasible cost. Conversely, the Vermont statute purports to prohibit the use of the avoided cost rate of Vermont utilities (which is required by FERC regulations) unless the VPUC affirmatively finds that the use of the market-based mechanism is inconsistent with federal law.

26.     In an order dated March 1, 2013,[8] the VPUC adopted a market-based mechanism under which renewable energy QFs would be required to compete against each other for the contracts as opposed to having contracts issued based upon avoided costs as determined by the statute. In that March 2013 Order, the VPUC concluded, albeit without much legal analysis, that its adopted market-based mechanism was consistent with federal law.

27.     The Standard Offer is the only program in Vermont for a qualifying facility, such as Allco's QFs, to obtain the long-term rate to which a QF is entitled under 18 C.F.R. §292.304(d)(2)(ii). But the Vermont Standard Offer program suffers from the identical illegalities declared unlawful in the Ninth Circuit's recent decision in *Winding Creek,* which is a case brought by an Allco affiliate. Just like California's standard offer for facilities 3MWs and under (which was called the Re-MAT), the Vermont Standard Offer requires QFs to bid against each other, thereby denying a QF a contract at the avoided cost rate determined by the state commission (which here is 13 cents per kwh for solar generating facilities as the VPUC determined for both the 2019 and 2020 cycles of the Standard Offer program).

28.     While the Vermont's Standard Offer imposes a cap on the amount of capacity available for certain types of facilities, it is uncapped with respect to other types of facilities, and does not require those facilities to compete for contracts.

---

[8] *Order Re Establishment of Standard-Offer Prices and Programmatic Changes to the Standard-Offer Program,* Dockets 7873 and 7874, Order of 3/1/13 (the "March 2013 Order").

## II.   Allco's Solar Generation Projects.

29.     On July 1, 2020, Allco submitted a commitment to VEPP to sell all the energy and capacity from 8 QFs, each with a nameplate capacity of 2.2MWs, and each at the 13 cents per kwh rate that was determined by the VPUC to represent the avoided cost rate.

30.     On April 1, 2019, Allco submitted a commitment to VEPP to sell all the energy and capacity from 8 solar energy QFs, each with a nameplate capacity to 2.2MWs, and each at a rate lower than the 13 cents per kwh rate that was determined by the VPUC to represent the avoided cost rate.

31.     Under the "must-take" obligation, Allco was and remains legally entitled to have VEPP execute the contracts for those facilities at the 13 cents per kwh rate that was determined by the VPUC to represent the avoided cost rate.

32.     At the time Allco established the LEO, the VPUC had established applicable avoided-cost rates, which was 13 cents per kwh over a 25-year term for solar QFs– an avoided cost rate that is not challenged by Allco.

33.     VEPP refused to execute written contracts for Allco's 16 QFs.

34.     VEPP would have executed the contracts for all of Allco's 16 facilities but for a quantitative cap on the amount of contracts the VPUC and the statute have imposed on VEPP. VEPP would have also executed at least some of the contracts for Allco's facilities if it were not for an unlawful pricing mechanism that the VPUC has imposed that ranks how the contract capacity made available is distributed. VEPP would have also executed at least some of the contracts for Allco's facilities if it were not for the statute preventing the use of the avoided cost price of 13 cents per kwh unless the VPUC has determined that its market-based mechanism is inconsistent with federal law.

35.     Section 210(f)(1) of PURPA establishes that the FERC's PURPA rules are the law of each state and, by operation of section 210(f)(1), are a requirement established by a state regulatory authority without any further action.  As the Supreme Court has stated, PURPA "requires electricity utilities to purchase electricity from, and to sell it to, qualifying cogenerator and small power production facilities," and PURPA requires "the state courts . . . to heed the constitutional command that the policy of *the federal Act is the prevailing policy in every state*." *FERC v. Mississippi*, 456 U.S. at 759-60 (internal quotations and citations omitted) (emphasis added).

36.     It is a fundamental element of law that an unlawful provision is void *ab initio* even if a court only declares it so after the fact.  "An [unlawful] act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S. Ct. 1121, 1125, 30 L. Ed. 178 (1886).

37.     Because neither VPUC nor VEPP can enforce an illegal cap, an unlawful allocation of limited capacity, or an unlawful restriction on a QF's entitlement to the LRAC determined by the VPUC, what remains at issue is the obligation to purchase power from plaintiffs at the avoided-cost rates in effect when their LEOs were formed in 2019 and 2020, which is the 13 cents per kwh avoided cost rate determined by the VPUC.

38.     Plaintiffs seek simple declaratory and equitable relief that the cap, the market-based mechanism and the an unlawful restriction on a QF's entitlement to the LRAC determined by the VPUC, violate PURPA, and to restore them to the position they would have occupied but for VEPP's unlawful refusal to execute the written contracts at the 13 cents per kwh avoided cost rate determined by the VPUC to be the avoided cost rate.

39.     Here, the facts are straightforward.  An avoided cost energy price was specified by the VPUC for Allco's solar facilities.  Allco were and remain entitled to enter into contracts for the sale of energy at those rates with VEPP.  The purported basis on which VEPP refused to execute the written contracts was unlawful and void *ab initio*.

## PARTIES

40.     Allco (Otter Creek Solar LLC, PLH Vineyard Sky LLC (f/k/a PLH LLC) and Allco Finance Limited) is the owner and developer of multiple operating solar electric generating facilities sized 2.2MWs or under.  Allco is also the owner and developer of sixteen to-be-built solar electric generating facilities located in Vermont that are each 2.2MWs that sought contracts from VEPP in 2019 and 2020.  Each plaintiff is a "qualifying small power producer" because each is the "owner" of a "qualifying small power production facility."  16 U.S.C. § 796(17)(D).  Each facility is a "qualifying small power production facility" or "QF" entitled to PURPA benefits.

41.     Defendant Anthony Roisman is Chair of the VPUC and is sued in his official capacity.

42.     Defendant Sarah Hofmann is Commissioner of the VPUC and is sued in her official capacity.

43.     Defendant Margaret Cheney is Commissioner of the VPUC and is sued in her official capacity.

## JURISDICTION AND VENUE

44.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action brings claims arising under federal law.

45.     This Court also has subject matter jurisdiction over this action because, under 16 U.S.C. § 824a-3(h)(2)(B), a "qualifying small power producer," after first petitioning FERC, may bring an enforcement action in a United States district court against a State regulatory authority to

enjoin violations of, and ensure compliance with, PURPA and FERC's regulations promulgated pursuant to PURPA.

46.    A "qualifying small power producer" is statutorily defined as "the owner or operator of a qualifying small power production facility." 16 U.S.C. § 796(17)(D).

47.    Allco is a "qualifying small power producer" because it is the "owner" of the 16 solar electric generating facilities located in Vermont at issue in this case and that are each 2.2MWs and each of which is a "qualifying small power production facility." Allco is also a "qualifying small power producer" because it is the owner or operator of solar electric generating facilities located in Minnesota, Indiana, Vermont, Connecticut, Massachusetts and California, each of which is a "qualifying small power production facility."

48.    The Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

49.    This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C § 2202; Rule 65 of the Federal Rules of Civil Procedure; and *Ex Parte Young*, 209 U.S. 123 (1908).

50.    This Court is empowered to grant injunctive relief *and all other appropriate relief* under PURPA section 210(h)(2)(B).

51.    This Court has personal jurisdiction over Defendants because each Defendant conducts a substantial portion of his or her duties as an officer of VPUC in the District of Vermont. VPUC is located at 112 State Street, Montpelier, VT  05620.

52.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Vermont.

**INJURIES TO BE REDRESSED**

53.     Allco has suffered an injury-in-fact because of the cap and the pricing mechanism that restricts Allco's right to a contract with VEPP and because of the restriction on a QF's entitlement to the LRAC determined by the VPUC.   As a result, Allco has been denied the opportunity to enter into a contract with VEPP on terms consistent with federal law.

54.     A favorable ruling in Allco's favor, declaring the cap and market-based pricing mechanism and the restriction on a QF's entitlement to the LRAC determined by the VPUC to be preempted and requiring Vermont and the VPUC to implement PURPA in a manner consistent with federal regulations concerning pricing and availability, would redress that injury-in-fact, by providing Allco with the opportunity to enter into a contract with VEPP on terms required by federal law.

55.     Allco has also suffered an injury-in-fact because without the contract at the terms and price to which it is entitled under federal law, Allco is unable to obtain the financing needed to construct its facilities.

56.     A favorable ruling in Allco's favor, declaring the cap and market-based pricing mechanism and the restriction on a QF's entitlement to the LRAC determined by the VPUC to be preempted and requiring VPUC to implement PURPA in a manner consistent with federal regulations concerning pricing and availability, is, on information and belief, substantially likely to result in a price high enough to allow Allco to obtain the financing needed to construct its 16 QFs and build those facilities.

**CLAIM FOR RELIEF**

**COUNT I: PREEMPTION**
**(Violation of the Supremacy Clause of the U.S. Constitution)**

57.     Allco restates and incorporates by reference each and every allegation in Paragraphs 1 through 56 as if fully set forth herein.

58.     Under the Supremacy Clause of the United States Constitution, a state law or regulation is preempted when Congress intends federal law to occupy the field, as well as in cases where the state law conflicts with federal statutes or regulations, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

59.     Under the Supremacy Clause, state laws or regulatory orders that conflict with federal law or that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), are preempted and invalid. *See Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983) ("Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."). Federal regulations with the force of law have the same preemptive power as a federal statute. *City of N.Y. v. FCC*, 486 U.S. 57, 63-64 (1988).

60.     In passing the Federal Power Act, Congress intended FERC to have exclusive jurisdiction over the field of wholesale electricity sales. Section 201(b) of the Federal Power Act, codified at 16 U.S.C. § 824(b), sets out the scope of federal regulatory power and draws a bright line between mutually exclusive spheres of state and federal regulatory authority. The Federal Power Act left no power in states to regulate wholesale electricity pricing or sales. *See also, Allco Finance Ltd. v. Klee*, 805 F.3d 89, 91 (2nd Cir. 2015) ("States may not act in [wholesale sale of electricity] this area unless Congress creates an exception. *Id.* § 824(b).")

61.     In 1978, Congress enacted section 210 of PURPA, codified at 16 U.S.C. § 824a-3, which created a limited role for States in regulating certain wholesale transactions.

62.     Other than the authority granted to the States in PURPA, States have no other authority to set wholesale electricity rates or regulate wholesale electricity transactions.

63.     In *California Pub. Utils. Comm'n*, 132 FERC P61,047 (2010) ("*CPUC I*") at ¶64,

the FERC restated those principles as applied to wholesale sales of electricity:

> The Commission's authority under the FPA includes the exclusive jurisdiction
> to regulate the rates, terms and conditions of sales for resale of electric energy
> in interstate commerce by public utilities. [*citing* 16 U.S.C. §§ 824, 824d,
> 824e; *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S.
> 354 (1988)]. While Congress has authorized a role for States in setting
> wholesale rates under PURPA, *Congress has not authorized other
> opportunities for States to set rates for wholesale sales in interstate commerce
> by public utilities, or indicated that the Commission's actions or inactions can
> give States this authority.* . . . .

(Emphasis added.)

64.     Because a State's *only* authority to regulate wholesale electricity sales is derived

from section 210 of PURPA, any State rule that conflicts with those requirements is necessarily

preempted. The FERC's regulations provide that a QF has three different bases on which it can

compel the sale of its energy and capacity:

> a. an energy only sale without a contract, in which case the QF is paid an as-
> available rate, *see*, 18 C.F.R § 292.304(d)(1);
>
> b. an energy and/or capacity sale over a specified term that the QF commits to at
> an as-available avoided cost rate at the time of delivery, *see*, 18 C.F.R §
> 292.304(d)(2)(i); or
>
> c. an energy and/or capacity sale over a specified term that the QF commits to at
> the long-term forecasted avoided cost rate at the time the QF commits, *see*, 18
> C.F.R § 292.304(d)(2)(ii).

65.     The FERC's regulations do not allow a utility or a State commission to pick which

choice applies to a QF.  Rather, it is the QF that has the right to choose the rate. *JD Wind 1 LLC*,

130 FERC ¶61,127 (2010) at P23.  Any rules established by Vermont must not conflict with that

requirement.  Any rules established by the VPUC must also be just, reasonable, and not unduly

discriminatory or preferential. 16 U.S.C. § 824d, 824e.   Thus, if Vermont establishes an avoided

cost calculation for QF solar generators 2.2MWs and under, such as under the Standard Offer

program, PURPA requires that it be offered to all such generators without discrimination.

66.     PURPA directed FERC to adopt rules requiring electric utilities to purchase power generated by, among others, "qualifying small power production facilities." 16 U.S.C. § 824a-3(a).  PURPA then directed state regulatory commissions, like VPUC, to implement FERC's regulations. *"[T]he federal Act is the prevailing policy in every state." FERC v. Mississippi*, 456 U.S. at 760.

67.     Both the volume cap and the VPUC's market-based mechanism, which requires a bidder to bid against each other violate PURPA.   In *Winding Creek*, the District Court for the Northern District of California and the Ninth Circuit Court of Appeals invalidated the exact market-based mechanism—one that requires a bidder to "bid to develop a project based upon its own cost structure."  In California that bidder-based cost structure mechanism was called the Re-MAT program and was held to be inconsistent with federal law.

68.     The way the VPUC administers the Standard Offer program is inconsistent with FERC's regulations under PURPA because it limits the utilities' total obligation to purchase electricity – in the case of VEPP as agent of the Vermont utilities, the VPUC limits that total obligation to less than 8MWs per year for facilities owned by independent developers. The VPUC further limits VEPP's total obligation to purchase electricity from different kinds of generation facilities.  These limitations on the utilities' purchase obligations conflict with FERC's regulation requiring that "[e]ach electric utility *shall purchase ... any* energy and capacity which is made available from a qualifying facility." 18 C.F.R. § 292.303(a) (emphasis added).  Accordingly, the Standard Offer program's limitation on VEPP's purchase obligation as agent for the utilities' is preempted.

69.     Under FERC's regulations, the rate for purchases shall be equal to the utility's avoided costs, 18 C.F.R. § 292.304, and the qualifying facility has the option of choosing from two different ways of calculating avoided costs: "(i) The avoided costs calculated at the time of

delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.* § 292.304(d)(2).

70.     VPUC's Standard Offer program purports to implement the second method, the avoided costs calculated at the time the obligation is incurred by calculating what that avoided cost price is. But instead of offering that avoided cost price to all QFs on a nondiscriminatory basis, the VPUC requires QFs to propose a lower price.   That type of downward-spiral pricing mechanism is not based on the *utilities' avoided* costs.   Instead, it is intended to reflect the *qualifying facilities' production* costs.

71.     Because the VPUC's Standard Offer pricing mechanism results in prices for electricity that do not reflect the utilities' avoided costs, it conflicts with federal regulations. *See Indep. Energy Producers*, 36 F.3d at 857 ("[FERC]'s regulations are clear that the rate to be paid by utilities for electric energy be determined according to the avoided costs to the *utility* of generating that energy or purchasing it elsewhere, and not according to the [qualifying facility's] efficiency."). Therefore, the VPUC's market-based pricing mechanism is preempted.

72.     The Vermont statute's restriction on a QF's entitlement to the LRAC determined by the VPUC unless the VPUC affirmatively decides that the VPUC's market based mechanism is inconsistent with federal law and thus is pre-empted because it stands as an obstacle and imposes an unlawful condition on a QF's access to the LRAC to which a QF is entitled to under PURPA.

73.     The discriminatory quantity cap imposed by the VPUC's administration of the Standard Offer program is plainly unlawful under PURPA and thus pre-empted. *See, Winding Creek.*, 932 F.3d at 865 (a "cap on the amount of energy utilities must purchase from QFs is impermissible under PURPA's must-take provision. [With a cap], a utility could purchase less energy than a QF makes available, an outcome forbidden by PURPA.").

74.     Moreover, because the VPUC's market-based pricing mechanism and cap and the restriction on the access to the LRAC rate are not authorized by PURPA, they fall outside the narrow exception that Congress has given to States to set rates for wholesale electricity sales. Except for the authority granted by PURPA, States are without power to set rates for wholesale electricity sales; the field of wholesale rate-setting is, with the exception of PURPA, reserved exclusively for FERC. For that reason, too, the VPUC pricing mechanism and cap and restriction on access to the avoided cost rate determined by the VPUC are preempted.

75.     Because VPUC's administration of the Standard Offer program conflicts with federal regulations under PURPA and are an obstacle to the achievement of Congress' policy in enacting PURPA, and because VPUC has no authority to set wholesale electricity rates or regulate wholesale electricity transactions other than that given by PURPA, the Vermont statute and the VPUC's administration of the Standard Offer program implementing the market-based mechanism, imposing caps on Allco's QF facilities and the restriction on the access to the 13-cents per kwh LRAC rate for solar QFs is preempted by federal law and violate the Supremacy Clause of the U.S Constitution.

76.     Allco will suffer irreparable harm by virtue of Vermont's and the VPUC's violation of the Supremacy Clause, because it will continue to be unable to enter into contracts at the long-run avoided cost price guaranteed by federal law, and is without any adequate remedy at law and no opportunity for compensation for Vermont's and the VPUC's violation of the Supremacy Clause.

77.     The public interest is also harmed by Vermont's and the VPUC's violation of federal law. Congress and FERC have determined that the public interest lies in encouraging the development of renewable energy generation, so long as consumers do not pay more for renewable

energy generation than they would for the electricity that would otherwise need to be produced, which here the VPUC has determined is 13 cents per kwh for solar QFs.

78.     Allco is entitled to judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the Vermont statute and the VPUC orders and its administration of the Standard Offer program implementing the market-based mechanism and imposing caps of Allco's facilities and restricting access to the 13-cents per kwh LRAC rate for solar QFs violates the Supremacy Clause (Article VI, Clause 2) of the United States Constitution.

79.     Allco is entitled to injunctive relief preventing Defendants from continuing to carry out its unlawful administration of the Standard Offer program, and requiring the Defendants to administer the Standard Offer program without the market-based mechanism, and without the imposing of discriminatory caps and other restrictions that has prevented Allco's 16 QF facilities from receiving contracts with VEPP at the 13-cents per kwh avoided cost rate determined by the VPUC.

80.     Such injunctive relief would harm Defendants less (if at all) than denying relief would harm Allco.

81.     In the words of Judge Donato of the Northern District of California from the *Winding Creek* case, the path to compliance is an "easy fix":

> THE COURT: I am wanting to hear from the CPUC. What are you doing with Re-MAT? I mean, freezing it and then just not doing anything is sort of creating your own harm. So, what is the PUC doing to make Re-MAT PURPA-compliant? It's not that hard, okay? I mean, the order was relatively straightforward, as I said. There's a megawatt cap that didn't stand. Seems to me, an easy fix. You just don't have the megawatt cap."

*Winding Creek Solar LLC v. Peevey*, No. 13-cv-04934-JD (N.D. Cal. February 8, 2018) (Dkt. No. 196 at 8).

82.     The fix here is easy too.   The cap and market-based mechanism and other restrictions that prevent VEPP from executing contracts with Allco at the 13-cents per kwh avoided

cost rate determined by the VPUC cannot stand and the fix is to have VEPP enter into those contracts with Allco at the VPUC determined avoided cost price of 13-cents per kwh.

### PRAYER FOR RELIEF

WHEREFORE, Allco prays that this Court enter an Order:

a. Declaring that the Vermont Standard Offer statute, and the VPUC's orders and its administration of the Standard Offer program implementing the market-based mechanism and imposing quantitative caps on Allco's solar QF facilities violate the Supremacy Clause of the U.S. Constitution insofar as they place numerical limits on VEPP's obligations to enter into contracts purchasing electricity from qualifying facilities;

b. Declaring that the Vermont Standard Offer statute, and the VPUC's orders and its administration of the Standard Offer program implementing the market-based mechanism and imposing caps on Allco's facilities violate the Supremacy Clause of the U.S. Constitution insofar as they establish a price different than the avoided cost rate calculated by the VPUC of 13 cents per kwh for 2019 and 2020 for Allco's solar QFs;

c. Declaring that the Vermont statute's prohibition on the use of the VPUC-calculated 13 cents per kwh avoided cost rate for solar QFs unless the VPUC affirmatively finds that the use of the market-based mechanism is inconsistent with federal law violates the Supremacy Clause of the U.S. Constitution;

d. Enjoining Defendants from continuing to apply the VPUC's market-based mechanism and caps on Allco's QF facilities;

e. Enjoining Defendants from continuing to apply any restriction that prevents access to the VPUC-calculated 13-cents per kwh rate for Allco's solar 2.2 MW QF

facilities;

f.  Enjoining Defendants to issue new orders requiring the VPUC to implement PURPA in a manner consistent with federal law;

g.  Enjoining Defendants to issue new orders requiring the VPUC to instruct VEPP to issue contracts to the 16 Allco solar QFs that committed to contracts in 2019 and 2020 and do so at the 13-cent per kwh avoided cost price determined by the VPUC for a term of 25 years; and

h.  Awarding Allco such further relief as the Court may deem just and equitable.

Dated: July 21, 2020                          Respectfully submitted,

                                              Thomas Melone
                                              Allco Renewable Energy Limited
                                              601 S Ocean Blvd.
                                              Delray Beach, FL 33483
                                              Phone: (212) 681-1120
                                              Email: Thomas.Melone@AllcoUS.com

                                              *Attorney for Plaintiffs*