UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 OCT 20 PM 12: 14

CLERK

BY _____

DEPUTY CLERK

ALLCO FINANCE LIMITED, OTTER )
CREEK SOLAR LLC, and PLH )
VINEYARD SKY LLC, )
)
Plaintiffs, )
)
v. )          Case No. 2:20-cv-103
)
ANTHONY ROISMAN, SARAH HOFMANN, )
and MARGARET CHENEY, in their official )
capacities as commissioners of the Vermont )
Public Utility Commission, )
)
Defendants. )

**OPINION AND ORDER**
**DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING**
**ORDER AND PRELIMINARY INJUNCTION AND ORDERING PLAINTIFFS**
**TO SHOW CAUSE WHY THEIR COMPLAINT SHOULD NOT BE DISMISSED**
**FOR LACK OF SUBJECT MATTER JURISDICTION**
(Doc. 9)

This matter came before the court for a hearing on October 9, 2020 on the motion

filed on September 24, 2020 by Plaintiffs Allco Finance Limited ("Allco"), Otter Creek

Solar LLC, and PLH Vineyard Sky LLC (collectively, "Plaintiffs") seeking a temporary

restraining order and preliminary injunction against Defendants Anthony Roisman, Sarah

Hofmann, and Margaret Cheney (collectively, "Defendants") in their official capacities as

commissioners of the Vermont Public Utility Commission ("VPUC") (Doc. 9). Plaintiffs

bring a Supremacy Clause challenge under the United States Constitution to VPUC's

implementation of a Standard Offer Program in violation of section 210 of the Public

Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. §§ 2601-45. In their

motion, Plaintiffs request the following relief:

> [A]n emergency injunction prohibiting the Defendants from awarding
> and/or approving and/or permitting the execution of interstate wholesale

electricity contracts in connection with their current "Standard Offer" energy solicitation while this case is pending. On September 17, 2020, the Defendants' agent, VEPP Inc. [("VEPP")], announced that it would issue contracts as early as October 16, 2020. Allco also requests that this Court issue a temporary restraining order (before 6:00 pm on October 15, 2020) preventing any such awards or approvals or issuance of any contracts while it considers Plaintiffs' motion.

(Doc. 9 at 1.) Defendants opposed Plaintiffs' motion on October 8, 2020.

On October 16, 2020, Plaintiffs advised the court that VEPP has agreed not to offer Standard Offer Program contracts before October 28, 2020.

Plaintiffs are represented by Thomas M. Melone, Esq. Defendants are represented by Assistant Attorneys General David R. McLean and Alison M. Stone.

## I.    Procedural Background.

At the court's October 9, 2020 hearing, neither party presented evidence. When the court raised the paucity of facts in Plaintiffs' submissions,[1] Plaintiffs stated that they would supplement the facts in their reply brief which they asked to file on October 16, 2020. In light of the expedited relief they requested, the court suggested an earlier filing date, to which Plaintiffs agreed.

Plaintiffs filed their reply brief on October 13, 2020 supported by two affirmations as well as fourteen exhibits containing hundreds of pages of documents. On October 16, 2020, Plaintiffs filed an index for their exhibits.

---

[1] As Defendants pointed out in their opposition: "Plaintiffs' motion does not identify the sixteen projects allegedly entitled to relief. Beyond Plaintiffs' conclusory statements, the record before the Court provides no way to verify that these projects are each 'qualified facilities' [under PURPA]." (Doc. 14 at 1-2.) The affirmation of Thomas Melone in support of Plaintiffs' motion for an emergency injunction ("Attorney Melone's Initial Affirmation") consists of eleven paragraphs primarily directed toward authentication of the exhibits attached thereto which do not include Plaintiffs' FERC Form 556 self-certifications. In Attorney Melone's Initial Affirmation, he does not claim that Plaintiffs are "qualified small power producers." With regard to whether the sixteen solar projects at issue are "qualifying small power production facilities," he asserts only that "On April 1, 2019, Allco submitted a commitment to VEPP to sell all the energy and capacity from 8 solar energy QFs, each with a nameplate capacity to 2.2MWs" and "[o]n July 1, 2020, Allco submitted a commitment to VEPP to sell all the energy and capacity from 8 QFs, each with a nameplate capacity of 2.2MWs" (Doc. 9-2 at 2,¶¶ 8-9) and that "VEPP refused to execute written contracts for Allco's 16 QFs." *Id.* at 2, ¶ 10.

Generally, a court will not consider evidence and arguments raised for the first time in a reply brief, especially without a reasonable explanation as to why this information could not have been addressed in the party's initial filing. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (holding the court "ordinarily will not consider issues raised for the first time in a reply brief"). In this case, no explanation, reasonable or otherwise, was provided. However, to deny Plaintiffs injunctive relief on this basis may work an injustice because whereas Plaintiffs claim that they will suffer irreparable harm if preliminary injunctive relief does not issue, Defendants make no similar claim of irreparable harm if it does. In these unusual circumstances, the court will consider factual information provided for the first time in Plaintiffs' reply brief.

## II.   Standard for Preliminary Injunctive Relief.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20 (citations omitted). "[W]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous ['serious questions'] standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995)) (alterations in original).

Although Plaintiffs contend that they are entitled to a preliminary injunction as a statutory right with no showing of irreparable harm, they cite no court that has endorsed

this approach in the context of PURPA.[2] Plaintiffs rely on two Second Circuit cases in support of their contention that the *Winter* standard is inapplicable.

In *SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975), the Second Circuit held that "[u]nlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are 'creatures of statute.'" *Id.* at 808. For this reason, the Second Circuit held that the SEC did not have to establish irreparable harm and the inadequacy of other remedies as a condition precedent to its pursuit of a statutory injunction enjoining a party's future illegal activities.

Similarly, in *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115 (2d Cir. 2010), the court held that "[r]equiring a party seeking a statutorily-sanctioned injunction to make an additional showing of irreparable harm . . . is not required." *Id.* at 121. The Second Circuit nonetheless required a "clear" and "substantial showing of a likelihood of success, both as to [a] violation [of the statute] and risk of recurrence[.]" *Id.* (internal quotation marks omitted). In that case, the Second Circuit drew a distinction between a state or local government seeking an injunction and injunctive relief sought by a private party.

PURPA authorizes injunctive relief but articulates no standard by which it may be obtained. Under Second Circuit precedent, a private party seeking injunctive relief pursuant to a statute must present a "clear" and "substantial showing" that the statute has been violated and that there is a risk of further future violations. *Id.* (internal quotation marks omitted). Here, regardless of the applicable standard for preliminary injunctive relief, Plaintiffs have not satisfied it.

---

[2] Plaintiffs' reliance on the injunction issued by the Second Circuit in *Allco Finance Limited v. Klee* is inapposite. In *Klee*, the Second Circuit issued a temporary injunction during the pendency of the appeal pursuant to Fed. R. App. P. 8, *see* Doc. 16-9 at 2-3, in a case the Second Circuit ultimately decided against Allco. In doing so, the Second Circuit reached no conclusion that PURPA authorized the issuance of preliminary injunctive relief as a matter of statutory right.

### III.    The Statutory and Regulatory Framework.

#### A.    The Federal Power Act and the Public Utility Regulatory Policies Act.

The Federal Power Act of 1920 ("FPA"), as amended, 16 U.S.C. §§ 791a-828c,

"gives the Federal Energy Regulatory Commission ("FERC") exclusive authority to

regulate the sale of electric energy at wholesale in interstate commerce." *Allco Fin. Ltd.

v. Klee*, 861 F.3d 82, 87 (2d Cir. 2017) (citing 16 U.S.C. § 824(b)(1)); *Hughes v. Talen

Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016). This exclusive authority is not without

limits because the FERC "may not regulate either within-state wholesale sales or . . .

retail sales of electricity" because "[s]tate utility commissions continue to oversee those

transactions." *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 768 (2016).

Congress enacted PURPA, an amendment to the FPA, "to combat the nationwide

energy crisis." *F.E.R.C. v. Mississippi*, 456 U.S. 742, 745 (1982). PURPA "establishes a

program of cooperative federalism that allows the States, within limits established by

federal minimum standards, to enact and administer their own regulatory programs,

structured to meet their own particular needs." *Id.* at 767 (internal quotation marks

omitted). Under PURPA, the FERC is authorized to promulgate "such rules as it

determines necessary to encourage cogeneration and small power production" while

ensuring that the rates paid to such power plants "shall be just and reasonable to the

electric consumers of the electric utility and in the public interest[.]" 16 U.S.C. §§ 824a-

3(a), (b)(1). A power plant that meets PURPA's small power or cogeneration

requirements is known as a qualifying facility ("QF"). *See* 18 C.F.R. § 292.203(a)

(establishing criteria for qualifying facilities).

States are required to implement the FERC's § 824a-3(a) PURPA regulations, 16

U.S.C. § 824a-3(f)(1), including those that obligate electric utilities to purchase energy

from QFs at rates set at the utility's avoided cost,[3] with state public utility commissions

having authority to establish the avoided cost rate. States have "latitude in determining

---

[3] Avoided costs are defined as "the incremental costs to an electric utility of electric energy or
capacity or both which, but for the purchase from the qualifying facility or qualifying facilities,
such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6).

the manner in which the regulations are to be implemented" and can choose to meet their mandate "by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to the FERC's rules." *FERC*, 456 U.S. at 751; *see also Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) ("[S]tates have broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction. States may, for example, order utilities to build renewable generators themselves, or . . . order utilities to purchase renewable generation.") (internal quotation marks omitted) (alterations in original).

Under PURPA, utilities may not use "a rate which exceeds the incremental cost to the electric utility of alternative energy." 16 U.S.C. § 824a-3(b). "PURPA mandates that [qualifying facilities] be given a choice between calculating the avoided-cost rate at the time of contracting or at the time of delivery." *Winding Creek Solar LLC v. Peterman*, 932 F.3d 861, 865 (9th Cir. 2019). Additionally, under the "must-take" provision the FERC requires that utilities "purchase *all* of the energy a [qualifying facility] provides." *Id.* at 863 (emphasis in original). Vermont law requires the VPUC to use the avoided cost if the market-based mechanism is inconsistent with federal law. 30 V.S.A. § 8005a(f)(2)(A)(i).

The VPUC has adjudicative jurisdiction over Vermont's qualified facilities. 30 V.S.A. § 209(a)(8). As amended in 2016, VPUC Rule 4.100 seeks to implement PURPA by requiring a utility to buy directly from a QF at an avoided cost rate derived from the New England wholesale markets. *See* Rule 4.104 and 4.109.[4] The avoided cost rate under Rule 4.100 is calculated without reference to the technology used to generate the electricity. At present, the avoided cost rate for Rule 4.100 projects is \$0.06/kWh. (Doc. 14 at 4.)

---

[4] *Available at* https://puc.vermont.gov/sites/psbnew/files/doc_library/4100-small-power-production_0.pdf.

## B.    Vermont's Standard Offer Program.

Vermont's Standard Offer Program, 30 V.S.A. § 8005a, promotes development of small renewable electric generation and is intended to provide an alternative to Rule 4.100 through an optional program for "a new standard offer plant" which has a "capacity of 2.2 MW or less" and is not net-metered.[5] 30 V.S.A. § 8005a(b). The Standard Offer Program requires Vermont distribution utilities to purchase renewable power from a contracted facility based on the utility's "pro rata share of total Vermont retail kWh sales for the previous calendar year[.]" 30 V.S.A. § 8005a(k)(2).

The VPUC's Standard Offer Program employs a market-based mechanism for awarding contracts which Plaintiffs contend, by its nature, prevents QFs from selling electricity at the avoided cost rate because QFs must compete for contracts.

Defendants argue that the Standard Offer Program is exempt from PURPA because it only involves intrastate commerce. In support of this assertion, Defendants point out that the Standard Offer Program requires a new standard offer plant to complete and submit an interconnection application for connecting the QF to the "subtransmission or distribution system of the applicable retail electricity provider." 30 V.S.A. § 8005a(i). In this respect, Defendants contend there is only an intrastate transfer of power between the QF and the electricity provider.

In 2012, the Standard Offer Program's total capacity was increased to 127.5 MW and adopted a reverse auction mechanism whereby VPUC determines project prices and conducts an annual review of costs. In addition, VPUC was directed to offer annually a finite amount of MWs in aggregated plant capacity for select Standard Offer contracts until the total cumulative plant capacity for the entire program is reached. *See* 30 V.S.A. § 8005a(c). The limitations on capacity resulted in annual availability of 5 MW between 2013-2015; 7.5 MW between 2016-2018; and 10 MW per year beginning on April 1, 2019. *See* 30 V.S.A. § 8005a(c)(1)(A).

---

[5] "Net metering means measuring the difference between the electricity supplied to a customer and the electricity fed back by the customer's net metering system during the customer's billing period[.]" 30 V.S.A. § 8002(15) (internal quotation marks omitted).

The Standard Offer Program calculates "avoided cost" differently from Rule 4.100:

> the term "avoided cost" means the incremental cost to retail electricity providers of electric energy or capacity, or both, which, but for the purchase through the standard offer, such providers would obtain from distributed renewable generation that uses the same generation technology as the category of renewable energy for which the Commission is setting the price.

30 V.S.A. § 8005a(f)(2)(B).

The VPUC oversees the Standard Offer application process and the granting of Standard Offer contracts. 30 V.S.A. § 8005a(h). Each year, VPUC issues a request for proposals ("RFP") to satisfy the available annual capacity under the Standard Offer Program, after it has reviewed and set program prices. Under the RFP, the lowest-priced compliant bids are awarded the annual capacity. The prices paid to Standard Offer facilities for the electricity they generate are set by the VPUC "with a goal of ensuring timely development at the lowest feasible cost." 30 V.S.A. § 8005a(f). Standard Offer contracts for solar facilities are for ten to twenty-five years. 30 V.S.A. § 8005a(e).

QFs in Vermont are not required to participate in either the Standard Offer Program or Rule 4.100 but may instead sell their power by net-metering or by contracting directly with a utility.

## C. Supremacy Clause Challenge.

In their Complaint, Plaintiffs assert a preemption claim based upon the Standard Offer Program's alleged violation of the Supremacy Clause of the United States Constitution. Under the Supremacy Clause, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) (citing U.S. CONST., Art. VI, cl. 2). Express preemption occurs "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue[.]" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). Implied preemption may "be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or

8

if there is an actual conflict between state and federal law." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) (internal quotation marks omitted). Preemption may also occur "where compliance with both federal and state regulations is a physical impossibility[,]" *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or where state law impedes the "execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

"[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (citing *Wyeth v. Levine*, 555 U.S. 555, 569 (2009)).

## IV.    Findings of Fact.

For the purposes of the pending motion, the court makes the following findings of fact:

1.    In support of their claim that they are "Qualified Small Power Producers," Plaintiffs submit eighteen "Certification[s] of Qualifying Facility (QF) Status for a Small Power Production or Cogeneration Facility," FERC Form 556. (Doc. 16-3.)

2.    Plaintiffs' FERC Form 556 submissions are all "self-certifications." FERC Form 556 advises that: "a notice of self-certification is a notice by the applicant itself that its facility complies with the requirements for QF status. A notice of self-certification does not establish a proceeding, and the Commission does not review a notice of self-certification to verify compliance." *Id.* at 63.

3.    Although an applicant may pay a filing fee and obtain a certification from the FERC that a facility is a QF pursuant to 18 C.F.R. § 292.207(b) or a declaratory order granting a waiver pursuant to 18 C.F.R. §§ 292.204(a)(3) and 292.205(c), a self-certification provides no FERC determination. As the instructions to Form 556 state:

> An applicant submitting a self-certification of QF status should expect to receive no documents from the Commission, other than the electronic acknowledgement of the receipt [of the filing and the docket number assigned to the filing]. Consistent with its name, a self-certification is a certification *by the applicant itself* that the facility meets the relevant requirements for QF status, and does not involve a determination by the Commission as to the status of the facility. An acknowledgement of receipt of self-certification, in particular, does not represent a determination by the Commission with regard to the QF status of the facility.

*Id.* at 4 (emphasis in the original)

4.      Allco Renewable Energy Limited ("Allco Renewable") is identified as the Applicant on each Form 556 and each form is signed by Thomas Melone as an officer of the entity on behalf of which the filing is made. In signing Form 556, Attorney Melone certified on behalf of the Applicant that he provided all the required information for each self-certification, and further certified that the provided information was true as stated to the best of his knowledge and belief.

5.      The Form 556 self-certifications for what Plaintiffs assert is "each of Plaintiffs['] Qualifying Facilities Submitted for Contracts in 2019 Standard Offer Program" (Doc. 17 at 1) include the following information:

a.      **Otter Creek Solar LLC:** an original certification for Otter Creek Solar project in Rutland, Vermont, described as a "facility expected to be installed by 10/1/14 and to begin operation on 11/1/14[,]" (Doc. 16-3 at 6), signed by Thomas Melone for Allco Renewable on April 30, 2013. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* Otter Creek Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

b.      **Otter Creek Solar LLC**: a revised Form 556 which indicates that it is for a facility that has "previously been certified as a QF" for Otter Creek Solar 2, 1901 Cold River Road, Rutland, Vermont to reflect changes "to a previously certified facility to be effective on 1/23/18" and to reflect "[c]hange(s) affecting plant equipment, fuel use, power production capacity and/or cogeneration thermal output[.]" *Id.* at 25. The revised Form 556 indicates "[t]he filing has been amended to reflect the new facility size and is expected to be installed on or before 1/1/2020 with a COD on 2/1/2020[,]" *id.* at 39, and was signed by Mr. Melone on behalf of Allco Renewable on January 25, 2018. Otter Creek Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

c.      **Willard Solar LLC:** an original certification for Willard Solar in Middlebury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" (Doc. 16-3 at 44.) This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The Form 556 was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. Willard Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

d.      **Brown Bridge Solar LLC:** an original certification for Brown Bridge Solar in Shrewsbury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" *Id.* at 63. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco

Renewable on August 23, 2019. Brown Bridge Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

e.     **Cannon Green Solar LLC:** an original certification for Cannon Green Solar in Middlebury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" *Id.* at 82. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The Form 556 was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. Cannon Green Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

f.     **Galusha Solar LLC:** an original certification for Galusha Solar in Shaftsbury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" *Id.* at 101. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. Galusha Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

g.     **Lemuel Solar LLC:** an original certification for Lemuel Solar in Shrewsbury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" *Id.* at 120. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. Lemuel Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

h.     **Rose Solar LLC:** an original certification for Rose Solar in Middlebury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" (Doc. 16-3 at 139.) This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. Rose Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

i.     **Safford Solar LLC:** an original certification for Safford Solar in Shaftsbury, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" *Id.* at 158. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. Safford Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

j.     **St. Andrews Solar LLC:** an original certification for St. Andrews Solar in Plainfield, Vermont, described as a "facility expected to be installed by 4/1/21 and to begin operation on 5/1/21[.]" *Id.* at 177. This

filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on August 23, 2019. St. Andrews Solar LLC is identified as the "direct owner" of this project and no "indirect owners" are listed.

k.      **PLH Vineyard Sky LLC:** an original certification for MacKinnon Solar in North Clarendon, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 196. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

l.      **PLH Vineyard Sky LLC:** an original certification for Greenbanks Hollow Solar 1 in Danville, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 215. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

m.      **PLH Vineyard Sky LLC:** an original certification for Greenbanks Hollow Solar 2 in Danville, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 234. This filing certifies that the instant facility has not "previously been certified as a QF[.]" (Doc. 16-3 at 234.) The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

n.      **PLH Vineyard Sky LLC:** an original certification for Greenbush Solar in Ferrisburgh, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 253. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

o.      **PLH Vineyard Sky LLC:** an original certification for Grey Solar, 1800 Cold River Road, North Clarendon, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 272. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of

Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

p.     **PLH Vineyard Sky LLC:** an original certification for Hawkins Solar in Ferrisburgh, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 291. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

q.     **PLH Vineyard Sky LLC:** an original certification for Kingsley Solar 1 in Clarendon, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 310. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

r.     **PLH Vineyard Sky LLC:** an original certification for Kingsley Solar 2 in Clarendon, Vermont, described as a "facility expected to be installed by 4/1/22 and to begin operation on 5/1/22[.]" *Id.* at 329. This filing certifies that the instant facility has not "previously been certified as a QF[.]" *Id.* The form was signed by Mr. Melone on behalf of Allco Renewable on July 21, 2020. PLH Vineyard Sky LLC and Allco are identified as the "direct owners" of this project and no "indirect owners" are listed.

6.     Because Plaintiffs do not identify the sixteen to-be-built solar projects in their Complaint, the court has no means of verifying whether the eighteen Form 556 self-certifications submitted with Plaintiffs' reply brief include those sixteen projects. Plaintiffs claim that Grey Solar was "originally known as Otter Creek 2 Solar" and Mackinnon Solar was "originally known as Otter Creek 1 Solar" (Doc. 16-5 at 2) but this same information is not included in the self-certifications for either of those projects. It is further not clear whether "Otter Creek 1 Solar" is different from "Otter Creek Solar 1" and whether "Otter Creek 2 Solar" is different from "Otter Creek Solar 2" or whether those are typographical errors.

7.     In the Form 556 self-certifications, Plaintiff Otter Creek Solar LLC is identified as the "direct owner" of Otter Creek Solar Project and Otter Creek Solar 2. Plaintiffs Allco and PLH Vineyard Sky LLC are identified as "direct owners" of Greenbush Solar, Kingsley Solar 1, Kingsley Solar 2, Mackinnon Solar, Greenbanks Hollar Solar 1, Greenbanks Hollar Solar 2, Grey Solar, and

Hawkins Solar. Plaintiffs are not identified in the Form 556 self-certification as having any direct or indirect ownership interest in Willard Solar, St. Andrews Solar, Safford Solar, Rose Solar, Lemuel Solar, Galusha Solar, Cannon Green Solar, or Brown Bridge Solar.

8.　　For each of the Form 556 self-certifications, Plaintiff Allco is identified as the "facility operator."

9.　　A November 4, 2016 Petition for Enforcement filed with the FERC (the "2016 Petition") identifies Otter Creek Solar LLC, Allco, and PLH LLC as the "Petitioners" and states that "Otter Creek and PLH are the owners of various small power production facilities in Vermont within the meaning of section 210(1) of PURPA." (Doc. 16-10 at 8.)

10.　　In the 2016 FERC petition, the Petitioners ask "the Commission to enforce PURPA in Federal District Court in order to invalidate and enjoin various aspects of Vermont's Rule 4.100, standard offer program, approvals for certain standard offer projects and the [Green Mountain Power ("GMP")]-affiliate power contracts[.]" *Id.* at 24. They assert that "PLH and Otter Creek did not receive contracts in the last standard offer solicitation [for 2015-2016] for 10 solar QFs." *Id.* at 33.

11.　　The FERC's January 3, 2017 Notice of Intent Not to Act states as follows:

1.　　On November 4, 2016, Otter Creek Solar LLC, Allco Finance Limited, and PLH LLC (Petitioners) filed a petition for enforcement pursuant to section 210(h)(2) of the Public Utility Regulatory Policies Act of 1978 (PURPA) [16 U.S.C. § 824a-3(h)(2) (2012)] against the Vermont Public Service Board (Vermont Commission) to remedy alleged improper implementation of PURPA.

2.　　Notice is hereby given that the Commission declines to initiate an enforcement action under section 210(h)(2) of PURPA. Our decision not to initiate an enforcement action means that Petitioners may themselves bring an enforcement action against the Vermont Commission in the appropriate court.

(Doc. 16-8 at 2) (footnote omitted).

12.　　Plaintiffs Otter Creek Solar LLC and PHL Vineyard Sky LLC, together with Allco Renewable and Mr. Melone have brought suit against Joseph Kulkin and Jane Does 1-3 and John Does 1-3 for defamation, injurious falsehood, and tortious interference with prospective contractual relations in an action styled *Allco Renewable v. Kulkin*, Case 2:20-cv-00044-jmc filed on March 19, 2020 (the "*Kulkin* action"). In their Complaint in the *Kulkin* action, Plaintiffs allege that Otter Creek Solar LLC is a party to Standard Offer Program contracts dated August 27, 2018 and February 3, 2018 for Otter Creek Solar 1 and 2, respectively.

(Doc. 1 at 2, ¶ 5 *Kulkin* action). The *Kulkin* action is currently pending in the District of Vermont before a different judge.

13.     Plaintiff Otter Creek Solar LLC together with Allco Renewable, Chelsea Solar LLC, and PLH LLC have filed suit against the VPUC, VEPP, VPUC Commissioners, Governor Phil Scott in his official capacity, and the State of Vermont in an action styled *Allco Renewable Energy Ltd. v. Volz*, 5:20-cv-00034-gwc (the "*Volz* action"). In their Complaint filed on March 9, 2020 in the *Volz* action, they assert, among other things, claims for civil rights violations and an unlawful taking based upon an alleged conspiracy to interfere with contracts awarded to them pursuant to the Standard Offer Program, including those awarded for the Otter Creek Solar 1 and Otter Creek Solar 2 projects. The *Volz* action is currently pending in the District of Vermont before a different judge.

14.     Plaintiffs submitted offers to VEPP in the 2019 and 2020 Standard Offer procurements to provide electricity to VEPP for a twenty-five-year period at rates and under standard contract terms approved by VPUC. Plaintiffs allege that by unconditionally committing to sell their output to VEPP on standard terms, Allco created a Legally Enforceable Obligation ("LEO") under section 210 of PURPA, which required VEPP to purchase all output from Allco's facilities. However, VEPP did not enter into written contracts accepting those offers.

15.     In their Complaint, Plaintiffs claim that Allco has suffered an injury-in-fact because of the cap and the pricing mechanism that restricts Allco's right to contract with VEPP. They further assert that "Allco has also suffered an injury-in-fact because without the contract at the terms and price to which it is entitled under federal law, Allco is unable to obtain the financing needed to construct its facilities." (Doc. 1 at 15, ¶¶ 53-56.) In the Supplemental Affirmation of Thomas Melone in support of Plaintiffs' motion for a preliminary injunction ("Attorney Melone's Supplemental Affirmation"), Attorney Melone makes the same or similar injury-in-fact assertions on behalf of all Plaintiffs. (Doc. 16-2 at 4, ¶ 18.)

## V.     Whether Plaintiffs have Established They are "Qualifying Small Power Producers" and their Solar Projects are "Qualifying Small Power Production Facilities."

"[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Defendants ask the court to find that Plaintiffs failed to sustain this burden because they have not established that they are "qualifying small power producers" entitled to bring this action and seek injunctive relief.

A "'qualifying small power producer' means the owner or operator of a qualifying small power production facility[.]" 16 U.S.C. § 796(17)(D). A "'qualifying small power

production facility' means a small power production facility that the Commission determines, by rule, meets such requirements (including requirements respecting fuel use, fuel efficiency, and reliability) as the Commission may, by rule, prescribe." 16 U.S.C. § 796(17)(C). A "[s]mall power production facility" "produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof" and "has a power production capacity which, together with any other facilities located at the same site (as determined by the Commission), is not greater than 80 megawatts[.]" 16 U.S.C. §§ 796(17)(A); 824a-3(l).

In their Complaint, Plaintiffs allege the following:

40. Allco (Otter Creek Solar LLC, PLH Vineyard Sky LLC (f/k/a PLH LLC) and Allco Finance Limited) is the owner and developer of multiple operating solar electric generating facilities sized 2.2MWs or under. Allco is also the owner and developer of sixteen to-be-built solar electric generating facilities located in Vermont that are each 2.2MWs that sought contracts from VEPP in 2019 and 2020. Each plaintiff is a "qualifying small power producer" because each is the "owner" of a "qualifying small power production facility." Each facility is a "qualifying small power production facility" or "QF" entitled to PURPA benefits.

(Doc. 1 at 13) (citation omitted).

In Attorney Melone's Initial Affirmation, he asserts under oath that the sixteen to-be-built solar projects at issue are "Allco's 16 QFs." (Doc. 9-2 at 2, ¶ 10.) In his Supplemental Affirmation, he asserts under oath that: "Plaintiffs are also the owners and developer[s] of sixteen to-be-built solar electric generating facilities located in Vermont that are each 2.2MWs that sought contracts from VEPP in 2019 and 2020[.]") (Doc. 16-2 at 3, ¶ 13.) The Form 556 self-certifications, however, indicate that eight of the sixteen solar projects are not owned by any Plaintiff. Plaintiffs provide no means for the court to reconcile the inconsistencies in their body of proof pertaining to ownership of these facilities. "[M]eeting the statutory definition of [a] 'small power production facility' is a necessary predicate to fulfilling the statutory definition of a 'qualifying small power production facility.'" *Winding Creek Solar LLC v. Peevey*, 2015 WL 675388, at \*3 (N.D.

Cal. Feb. 17, 2015).[6]

The court summarizes the conflicts in the evidence by dividing the solar projects into three groups. Based upon their Form 556 self-certifications, Plaintiffs are neither direct owners nor indirect owners of the first group of solar projects: Willard Solar, St. Andrews Solar, Safford Solar, Rose Solar, Lemuel Solar, Galusha Solar, Cannon Green Solar, or Brown Bridge Solar. Although Plaintiffs may well have a relationship with the entities that own these projects, there is no evidence of that relationship before the court. Without more, these projects cannot serve as the basis for injunctive relief because Plaintiffs have not established their standing to pursue claims on behalf of projects in which they have demonstrated no "legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The second group of solar projects are the Otter Creek solar projects. Attorney Melone's Supplemental Affirmation asserts that all Plaintiffs own these solar projects. *See* Doc. 16-2 at 3 ("Plaintiffs are also the owners and developer[s] of sixteen to-be-built solar electric generating facilities . . . that sought contracts from VEPP in 2019 and 2020"). In the Form 556 self-certifications pertaining to this group of projects, however, Plaintiff Otter Creek Solar LLC is identified as the sole "direct owner" of the Otter Creek Solar Project[7] and Otter Creek Solar 2 and no "indirect owners" are listed. It is not clear whether the Otter Creek Solar Project is also known as Otter Creek Solar 1.

In their list of the FERC docket numbers assigned to the sixteen projects, Plaintiffs assert that Grey Solar was "originally known as Otter Creek 2 Solar" and Mackinnon Solar was "originally known as Otter Creek 1 Solar." (Doc. 16-5 at 2.) However, the corresponding Form 556 self-certifications for the Grey Solar and MacKinnon Solar projects do not reflect this same information. In addition, those self-certifications do not

---

[6] Plaintiff Allco may seek to rely on its status as an "operator" of the sixteen to-be-built projects but the other Plaintiffs cannot claim this same status.

[7] As noted, it is not clear whether the Otter Creek Solar Project is also known as Otter Creek Solar 1. It is also not clear whether Otter Creek Solar 1 and Otter Creek 1 Solar are the same or whether Otter Creek Solar 2 and Otter Creek 2 Solar are the same.

identify Otter Creek Solar as the projects' owner. Rather, they identify Plaintiffs Allco and PHL Vineyard Sky LLC as the only "direct owners" with no "indirect owners" listed.

The third and final group of solar projects consists of Greenbush Solar, Kingsley Solar 1, Kingsley Solar 2, MacKinnon Solar, Greenbanks Hollar Solar 1, Greenbanks Hollar Solar 2, Grey Solar, and Hawkins Solar. In Attorney Melone's Supplemental Affirmation, all Plaintiffs are identified as "owners" of these projects. *See* Doc. 16-2 at 3. According to the Form 556 self-certifications for this third group, however, only Plaintiffs Allco and PLH Vineyard Sky LLC are "direct owners" of these projects, and no "indirect owners" are listed.

The confusion regarding Plaintiffs' status as an "owner" of the sixteen solar projects at issue may, alone, be sufficient grounds to deny preliminary injunctive relief. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists"); *United States ex. rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999) ("[Because] federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction"). To the extent Allco relies solely on its "operator" status of the sixteen projects, it makes no effort to establish why it has standing to bring claims on behalf of to-be-built projects. Although the court does not rule out that standing may be shown in that circumstance, it does not presume its existence. *See Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (requiring dismissal of complaint if "plaintiff's standing does not adequately appear from all materials of record"). In any event, even if Allco could rely on its status as an "operator," the remaining Plaintiffs could not.

Assuming *arguendo* that Plaintiffs can established that they either "own" or "operate" all sixteen unidentified solar projects set forth in their Complaint, they must further demonstrate those projects are "qualifying small power production facilities" under PURPA. Form 556 makes clear that a self-certification and its receipt by the FERC do not, alone, serve as the FERC's determination of this status:

> Consistent with its name, a self-certification is a certification *by the applicant itself* that the facility meets the relevant requirements for QF status, and does not involve a determination by the Commission as to the status of the facility. An acknowledg[e]ment of receipt of a self-certification, in particular, does not represent a determination by the Commission with regard to the QF status of the facility.

(Doc. 16-3 at 213) (emphasis in the original).

The FERC's regulations provide a means by which self-certification may establish the status of a "qualifying small power production facility,"[8] but Plaintiffs' conclusory statements do not demonstrate compliance:

> 14. Each Plaintiff is a "qualifying small power producer" because each is the "owner" or "operator" of a "qualifying small production facility." 16 U.S.C. § 796(17)(D). Each facility is a "qualifying small power production facility" or "QF" entitled to PURPA benefits.
>
> 15. Plaintiffs are a "qualifying small power producer" because one or more of them is the "owner" of one or more of the 16 solar electric generating facilities located in Vermont at issue in this case, each of which is a "qualifying small power production facility." Plaintiffs are also a "qualifying small power producer" because one or more of them are the owner or operator of solar electric generating facilities located in Minnesota, Indiana, Vermont, Connecticut, Massachusetts and California, each of which is a "qualifying small power production facility."

Attorney Melone's Supplemental Affirmation (Doc.16-2 at 4.)

Although Plaintiffs' self-certifications supply some of the requisite information, the court is not required to comb through Plaintiffs' evidence for indicia of compliance.

---

[8] The FERC's regulations provide:

> **Self-certification**. The qualifying facility status of an existing or a proposed facility that meets the requirements of § 292.203 [meets the maximum size criteria specified in § 292.204(a) and meets the fuel use criteria specified in § 292.204(b) and has filed with the Commission a notice of self-certification pursuant to § 292.207(a)] may be self-certified by the owner or operator of the facility or its representative by properly completing a Form No. 556 and filing that form with the Commission, pursuant to § 131.80 of this chapter, and complying with paragraph (c) of this section [governing notice requirements which includes concurrent service of "a copy of such filing on each electric utility with which it expects to interconnect, transmit[,] or sell electric energy to[.]"

18 C.F.R. § 292.207(a).

*See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) (observing that a court need not search the record to find evidence in support of a party's argument).

Because Plaintiffs have not provided sufficient credible evidence in support of their contention that they are "qualifying small power producers" because they own or operate sixteen "qualifying small power production facilities" which are the subject of their Complaint, they have not demonstrated a statutory prerequisite to injunctive relief.

## VI.   Whether Plaintiffs Exhausted Their Administrative Remedies.

Even if Plaintiffs could establish their entitlement to bring an action as "qualifying small power producers," Defendants argue that Plaintiffs have failed to exhaust their administrative remedies under PURPA. The court agrees.

Under PURPA,

> [a]ny electric utility, qualifying cogenerator, or qualifying small power producer may petition the Commission to enforce the requirements of subsection (f) as provided in subparagraph (A) of this paragraph. If the Commission does not initiate an enforcement action under subparagraph (A) against a State regulatory authority or nonregulated electric utility within 60 days following the date on which a petition is filed under this subparagraph with respect to such authority, the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority or nonregulated electric utility to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate. The Commission may intervene as a matter of right in any such action.

16 U.S.C. § 824a-3(h)(2)(B). PURPA's exhaustion requirement imposes no deadline for filing suit after the sixty-day period.[9]

"PURPA requires administrative exhaustion for claims brought by qualified facilities that are attempting to enforce the requirements of [16 U.S.C.] § 824a-3(f)." *Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 96 (2d Cir. 2015) (footnote omitted). A preemption claim "challenging a state *regulation promulgated under* § 824a-3(f)" is a

---

[9] *See Woodford v. Ngo*, 548 U.S. 81, 99 (2006) (observing that some exhaustion requirements impose no deadlines for the commencement of an action, "*explicitly do[] not require* timely commencement," and thus merely require "exhaustion of available administrative remedies with no reference to a federally based limiting principle") (emphasis in original).

"straightforward application of [the] administrative exhaustion requirement[.]" *Id.* at 96-
97 (emphasis in original).

The Second Circuit has held that administrative exhaustion is a jurisdictional
requirement for PURPA claims and that a petitioner has the burden of establishing
exhaustion. *Id.* at 97-98 ("[W]e affirm the dismissal of [plaintiff's PURPA-enforcement]
claims on the . . . grounds that [plaintiff] failed to comply with the administrative
exhaustion requirement."); *Niagara Mohawk Power Corp. v. Fed. Energy Regul.
Comm'n*, 306 F.3d 1264, 1270 (2d Cir. 2002) (affirming dismissal of plaintiff's PURPA
claim against the state regulatory board and its commissioners "for lack of subject matter
jurisdiction because of [plaintiff's] failure to exhaust its administrative remedy by
petitioning FERC to bring an enforcement action against the [state regulatory board] in
the first instance."). As a result, if a plaintiff fails to satisfy the exhaustion requirement
before bringing a PURPA claim, a court must dismiss the claim for lack of subject matter
jurisdiction. *See Klee*, 805 F.3d at 97-98 (citing *Niagara Mohawk Power*, 306 F.3d at
1270).

The Second Circuit has not recognized the doctrine of "vicarious exhaustion" in
the context of PURPA. In other contexts, a plaintiff may rely on "[v]icarious exhaustion
. . . to overcome his or her own failure to satisfy the statutory requirement to exhaust
administrative remedies if 'it can fairly be said that' exhaustion would serve 'no
conciliatory purpose.'" *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 36
(D.C. Cir. 2014) (quoting *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C. Cir. 1981)).
Plaintiffs do not claim exhaustion in this case would have "no conciliatory purpose[.]"
*Foster*, 655 F.2d at 1322. Moreover, "where[, as here,] the two complaints differ to the
extent that there is a real possibility that one of the claims might be administratively
settled while the other can be resolved only by the courts," vicarious exhaustion does not
apply. *Id.*

In the 2016 FERC Petition, the Petitioners[10] requested the following relief: "The Petitioners seek the Commission to enforce PURPA in Federal District Court in order to invalidate and enjoin various aspects of Vermont's Rule 4.100, standard offer program, approvals for certain standard offer projects and the GMP-affiliate power contracts, each as described herein." (Doc. 16-10 at 24.) The Petitioners described the operative facts as follows: "Otter Creek offered GMP all the energy and capacity from five solar QFs, which offer GMP rejected. GMP claimed it had no direct obligation to purchase energy or capacity under Old Rule 4.100" and "PLH submitted 10 of their projects to the [Vermont Public Service Board] for a standard offer contract. The VPSB refused to approve the standard offer contracts even though the price offered by PLH was *less than* all the wholesale electricity contracts that the VPSB approved with GMP and GMP's unregulated affiliate." *Id.* at 23-24 (emphasis in the original).

In contrast, in their Complaint in this action, Plaintiffs describe the factual basis for their legal challenge as follows:

2. In 2019 and 2020, Allco committed to provide electricity to VEPP for a 25-year period at rates and under standard contract terms approved by the Vermont Public Utility Commission ("VPUC"). By unconditionally committing to sell their output to VEPP on those standard terms, Allco created a "Legally Enforceable Obligation" ("LEO") under section 210 of [PURPA], requiring VEPP to purchase all output from Allco's facilities.

\*\*\*

29. On July 1, 2020, Allco submitted a commitment to VEPP to sell all the energy and capacity from 8 QFs, each with a nameplate capacity of 2.2MWs, and each at the 13 cents per kwh rate that was determined by the VPUC to represent the avoided cost rate.

30. On April 1, 2019, Allco submitted a commitment to VEPP to sell all the energy and capacity from 8 solar energy QFs, each with a nameplate capacity to 2.2MWs, and each at a rate lower than the 13 cents per kwh rate that was determined by the VPUC to represent the avoided cost rate.

---

[10] The 2016 Petition does not name Plaintiff PHL Vineyard Sky LLC as a "Petitioner." Although Plaintiffs allege in their unverified Complaint that this is the same entity as PHL LLC, (Doc. 1 at 13, ¶ 40), that contention is not supported by the citation to any evidence. PLH LLC remains a plaintiff in the *Volz* action, which arguably supports a conclusion that it is a separate and distinct entity from PLH Vineyard Sky LLC.

31. Under the "must-take" obligation, Allco was and remains legally entitled to have VEPP execute the contracts for those facilities at the 13 cents per kwh rate that was determined by the VPUC to represent the avoided cost rate.

32. At the time Allco established the LEO, the VPUC had established applicable avoided-cost rates, which was 13 cents per kwh over a 25-year term for solar QFs—an avoided cost rate that is not challenged by Allco.

33. VEPP refused to execute written contract for Allco's 16 QFs.

34. VEPP would have executed the contracts for all of Allco's 16 facilities but for a quantitative cap on the amount of contracts the VPUC and the statute have imposed on VEPP. VEPP would have also executed at least some of the contracts for Allco's facilities if it were not for an unlawful pricing mechanism that the VPUC has imposed that ranks how the contract capacity made available is distributed. VEPP would have also executed at least some of the contracts for Allco's facilities if it were not for the statute preventing the use of the avoided cost price of 13 cents per kwh unless the VPUC has determined that its market-based mechanism is inconsistent with federal law.

(Doc. 1 at 1, 11.)

Even a cursory comparison between the 2016 Petition and Plaintiffs' Complaint reveals that they rely on different facts, different qualifying facilities,[11] different Standard Offer Program terms, and different calendar years. As Defendants point out, the 2016 Petition "obviously could not have raised issues arising out of [the 2019 and 2020] bidding processes that had yet to occur." (Doc. 14 at 15.)

The question before the court is whether *some* factual and legal similarities between the 2016 FERC Petition and Plaintiffs' Complaint constitute an exhaustion of administrative remedies. The court finds that they do not. Courts routinely reject exhaustion claims on this basis. *See, e.g.*, *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464

---

[11] Although Plaintiffs claim that two of the sixteen solar projects in the Complaint were included in the 2016 Petition, a point that is by no means clear, Plaintiffs cannot show injury-in-fact with regard to those projects because Plaintiff Otter Creek Solar LLC was awarded Standard Offer Program contracts for each of them as evidenced by Plaintiffs' judicial admissions in the *Kulkin* and *Volz* actions. *See Klee*, 805 F.3d at 94 n.3 ("For an injury to be cognizable as an injury-in-fact, the plaintiff must have suffered the injury at the time of the complaint's filing") (citation omitted).

(1st Cir. 1996) (observing that purpose of exhaustion of administrative remedies would be "frustrated if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action"); *United States v. Wills*, 2020 WL 5073663, at *3 (E.D. La. Aug. 26, 2020) (holding that "[f]or a petitioner's request to the warden to exhaust administrative remedies . . . the request must be premised on the same facts alleged in the corresponding motion filed with the court") (citation omitted); *United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020) ("[T]he Court does not view the administrative exhaustion of an initial request for compassionate release as serving to discharge that requirement for subsequent requests based on different evidence and argument. Simply put, the Court cannot consider a motion for compassionate release that is based on evidence or arguments that weren't presented to the Bureau of Prisons first"); *Med. Ctr. of Independence v. Califano*, 433 F. Supp. 837, 840 (W.D. Mo. 1977) (observing that even though the same facts and evidence applied for the years 1970-1972, and even though the outcome was allegedly predictable, exhaustion for one year does not excuse failure to exhaust for other challenged years). The court thus finds that Plaintiffs have failed to exhaust their administrative remedies for the "contracts from VEPP in 2019 and 2020" (Doc. 1 at 13) identified in their Complaint. Any other approach would frustrate the purposes of exhaustion:

> Exhaustion of administrative remedies serves two main purposes.
>
> First, exhaustion protects "administrative agency authority." Exhaustion gives an agency an opportunity to correct its own mistakes with respect to programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures.
>
> Second, exhaustion promotes efficiency. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court. And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.

*Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (citations and internal quotation marks omitted).

If the 2016 Petition was deemed sufficient for exhaustion of administrative remedies for a 2020 Complaint based on different facts, it would deprive the FERC of the opportunity to correct its own errors, respond to developments in the law, and save petitioners the trouble and expense of having to litigate their claims in federal court. It would also burden the federal courts with lawsuits that could more easily and more expeditiously be decided at the agency level. Exhaustion is thus not form over substance but a critical step in the adjudicative process. As the Supreme Court has observed:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits). This Court has described the doctrine as follows: [A]s a general rule . . . courts should not topple over administrative decisions unless the administrative body not only has erred, *but has erred against objection made at the time appropriate under its practice*. Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Woodford*, 548 U.S. at 90-91 (citations and internal quotation marks omitted) (emphasis in original).

Because Plaintiffs have failed to establish they have exhausted their administrative remedies with regard to the Supremacy Clause claim set forth in their Complaint under PURPA, their request for a temporary restraining order and a preliminary injunction must be DENIED. *See Klee*, 805 F.3d at 96 (holding failure to exhaust is fatal for a claim under PURPA and further holding that "a party cannot evade PURPA's administrative exhaustion requirement by characterizing an otherwise covered PURPA-related equitable claim as a Supremacy Clause claim").

25

Because Plaintiffs have not established the court's subject matter jurisdiction by a preponderance of evidence, s*ee Makarova*, 201 F.3d at 113, the court is not authorized to proceed further with its analysis of any other aspect of Plaintiffs' request for injunctive relief. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 501-02 (2006) (holding that "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived" and "when a federal court concludes that it lacks subject-matter jurisdiction, the complaint must be dismissed in its entirety.").

Rather than dismiss Plaintiffs' Complaint *sua sponte*, the court ORDERS Plaintiffs to show cause why this case should not be dismissed for lack of subject matter jurisdiction within twenty (20) day of this Opinion and Order.

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiffs' motion for a temporary restraining order and a preliminary injunction (Doc. 9) and ORDERS Plaintiffs to show cause why this case should not be dismissed for lack of subject matter jurisdiction within twenty (20) days of this Opinion and Order.

Dated at Burlington, in the District of Vermont, this 20th day of October, 2020.

Christina Reiss, District Judge
United States District Court