U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT**

2020 NOV 12 PM 3: 22

**DISTRICT OF VERMONT**

CLERK

BY_____ ԼႪ✓_____
DEPUTY CLERK

| | |
|---|---|
| ALLCO FINANCE LIMITED, OTTER CREEK SOLAR LLC, and PLH VINEYARD SKY LLC | Case No. 2:20-cv-00103-cr |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| ANTHONY ROISMAN, SARAH HOFMANN and MARGARET CHENEY, in their official capacities as commissioners of the Vermont Public Utility Commission. | |
| Defendants. | |

**NATURE OF THE ACTION**

1.      This case concerns the legality of certain aspects of Vermont's standard offer program (the "Standard Offer"), *see*, 30 V.S.A. § 8005a, which is a program administered by Defendants Anthony Roisman, Sarah Hofmann and Margaret Cheney, in their official capacities as commissioners of the Vermont Public Utility Commission ("VPUC") under which the Defendants compel Vermont's electric utilities to purchase electricity from certain small renewable energy generating facilities. Under Vermont's Standard Offer program, VEPP Inc., a state-created entity ("VEPP") acts as a purchasing agent on behalf of Vermont's electric utilities. VEPP acts, or refrains from acting, at the direction of the Defendants.

2.      The sale contracts executed under Vermont's Standard Offer program are wholesale sales of electricity in interstate commerce,[1] which are subject to the jurisdiction of the

---

[1] *See, New York v. FERC*, 535 U.S. 1 (2002). Noting that electrons travel at the speed of light of 186,000 miles per second, the United States Supreme Court stated that there are only three areas of the United States where sales are not interstate—Alaska, Hawaii and most of Texas. *Id.* at 5:

Federal Energy Regulatory Commission ("FERC") under the Federal Power Act ("FPA"), 16 U.S.C. §791a *et seq.*, and section 210 of the Public Utility Regulatory Policies Act, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA").

3.     This action seeks to have two aspects of Defendants' administration of Vermont's Standard Offer program declared invalid and pre-empted under the FPA and PURPA. This action does not seek to invalidate the Standard Offer program *in toto*. The first unlawful aspect is what is called the market-based mechanism, which sets a per kilo-watt hour ("KWH") price based upon an auction mechanism requiring renewable energy developers to bid against each other. The second unlawful aspect is the quantitative cap on the amount of contracts under the Standard Offer program imposed on developers for their small solar electric facilities.

4.     Last year in a substantially similar case brought by an Allco Finance Limited ("AFL") owned limited liability company, Winding Creek Solar LLC, the Court of Appeals for the Ninth Circuit held that quantitative caps and the use of a pricing mechanism that requires renewable energy developers to bid against each other (as the Defendants' orders and the Vermont statute require) violate PURPA. *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980 (N.D. Cal. 2017) (Donato, J.) *aff'd sub nom., Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019) ("*Winding Creek*"). *See, id.,* 932 F.3d at 865 (a "cap on the amount of energy utilities must purchase from QFs is impermissible under PURPA's must-take provision. [With a cap], a utility could purchase less energy than a QF makes available, an outcome forbidden by PURPA.").[2]

---

electricity is now delivered over three major networks, or "grids" in the continental United States. Two of these grids -- the "Eastern Interconnect" and the "Western Interconnect" -- are connected to each other. It is only in Hawaii and Alaska and on the "Texas Interconnect" -- which covers most of that State -- that electricity is distributed entirely within a single State. In the rest of the country, any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce.

[2] "[Q]ualifying small power production facilit[ies]" under the statute and "Qualifying Facilities" or QFs under FERC's regulations, *see* 16 U.S.C. § 796(17)(C); 18 C.F.R. § 292.203).

5.      The Defendants' market-based mechanism *only* serves its intended purpose (*i.e.*, setting a price below avoided costs) if capacity is capped or limited, thus forcing renewable developers to compete against each other. If there can be no cap as *Winding Creek* confirms, then the reverse auction does not, and cannot, function because renewable energy developers are not required to compete, resulting in a process where all bids would be set at the ratepayer-neutral avoided cost price determined by the Defendants.

6.      This complaint is brought under section 210(h)(2)(B) of PURPA, 16 U.S.C. § 824a-3(h)(2)(B), which authorizes any "qualifying small power producer" to bring an action in the appropriate United States district court to require a State regulatory authority to comply with PURPA's requirements, if such qualifying small power producer has first asked the FERC to bring such action and the FERC has failed to do so after 60 days.

7.      Plaintiff AFL is a "qualifying small power producer" under PURPA because AFL is the operator of a "qualifying small power production facility." 16 U.S.C. § 796(17)(D).

8.      Plaintiffs AFL, Otter Creek Solar LLC ("OCS") and PLH Vineyard Sky LLC ("PLH") are each a "qualifying small power producer" under PURPA because each is an owner of a "qualifying small power production facility." 16 U.S.C. § 796(17)(D).

9.      AFL, OCS and PLH satisfied the administrative exhaustion requirement of 16 U.S.C. § 824a-3(h)(2) by first asking the FERC to bring an action against the VPUC. AFL, OCS and PLH filed the petition for enforcement with the FERC on November 4, 2016 (the "FERC Petition"). FERC issued its notice of intent not to act on January 3, 2017, which declined to initiate its own enforcement action against the VPUC under section 210(h)(2)(a) but authorized Plaintiffs to proceed in federal district court. *Otter Creek Solar LLC*, 158 FERC ¶ 61,001 (2017).

## STATEMENT OF FACTS

**I.     Statutory and Regulatory Framework.**

**A.     Congress Enacts PURPA to Incentivize Renewable Power Development.**

10.     PURPA was enacted as part of the National Energy Act of 1978 as part of the United States' response to the repeated energy crises of the 1970s.  President Carter called that response "the Moral Equivalent of War."[3]  During deliberations on the National Energy Act, Frank Press, the science advisor to President Carter observed prophetically:

> Fossil fuel combustion has increased at an exponential rate over the last 100 years. As a result, the atmospheric concentration of $CO_2$ is now 12 percent above the pre-industrial revolution level and may grow 1.5 to 2.0 times that level within 60 years. Because of the greenhouse effect of atmospheric $CO_2$, the increased concentration will induce a global climatic warming of anywhere from $0.5°$ to $5°$ C. . .. The urgency of the problem derives from our inability to shift rapidly to non-fossil fuel sources once the climatic effects become evident not long after the year 2000; the situation could grow out of control before alternate energy sources and other remedial actions become effective.[4]

11.     PURPA is even more relevant today.  Last November, a new report by 11,258 scientists in 153 countries from a broad range of disciplines warned that the planet "clearly and unequivocally faces a climate emergency."[5]  Making matters worse, the current pandemic and resulting global public health crisis have shined a spotlight on the human health toll of fossil fuel generation.  A recent study by the T.H. Chan School of Public Health at Harvard University concludes: "A small increase in long-term exposure to [fossil fuel pollutant] PM 2.5 leads to a

---

[3]  Speech of President Jimmy Carter, April 18, 1977.  *See New York Times*, https://www.nytimes.com/1977/04/20/archives/moral-equivalent-of-war.html.

[4]  Memorandum from Frank Press to the President, Release of Fossil $CO_2$ and the Possibility of Catastrophic Climate Change (July 7, 1977) available at https://www.jimmycarterlibrary.gov/digital_library/sso/148878/31/SSO_148878_031_07.pdf at 6.

[5]  "*More than 11,000 scientists from around the world declare a 'climate emergency.'*" *Washington Post*, November 5, 2019, https://www.washingtonpost.com/science/2019/11/05/more-than-scientists-around-world-declare-climate-emergency/.

large        increase        in        the        COVID-19        death        rate."
https://www.medrxiv.org/content/10.1101/2020.04.05.20054502v2.[6]

12.    PURPA remains the only federal law requiring utilities to purchase renewable energy; hence, PURPA "was and remains a primary incentive for renewable power development." Steven Ferrey et al., *Fire and Ice: World Renewable Energy and Carbon Control Mechanisms Confront Constitutional Barriers*, 20 Duke Envtl. L. & Pol'y F. 125, 140 (2010).

13.    Vermont consumes almost four times as much energy as it produces, but total energy consumption is the smallest of all the states. https://www.eia.gov/state/?sid=VT. The Energy Information Administration estimates that in 2017 Vermont produced approximately 38 trillion BTUs in-state. Total consumption was approximately 135 trillion BTUs. Where does that excess of 97 trillion BTUs come from? The largest source is from fossil fuel generation, which is a silent killer of the environment and people.

14.    The energy from fossil fuels that Vermont chooses to consume rather than building the necessary solar energy facilities within its borders and comply with federal law also causes a raft of other health issues that span generations and that disproportionately affect the poorest communities. The fossil fueled Mystic Generating Station in Massachusetts is one such power plant that supplies electricity to the ISO-New England region from which Vermont gets its electricity. Recently, the Boston Globe reported on the generational suffering that families like Sean Collie's have endured and still endure from Vermonters and New Englanders flipping on the light switch. *See*, https://www.bostonglobe.com/2020/06/14/metro/effort-keep-states-largest-power-plant-open-fuels-concern-about-climate-public-health/ ("The towering smokestacks of the state's largest power plant have loomed for decades over the Boston area, spewing pollutants that

---

[6] PM 2.5 particulate matter is pumped into the air by fossil fuel plants. PM 2.5 particulate matter is 2.5 micrometers or less. The width of an average human hair is 30 times larger than a PM 2.5 particle.

produce smog, warm the planet, and exacerbate asthma and other respiratory illnesses, such as the coronavirus. ... Sean Collie, who has lived a few blocks from the Mystic plant for 23 years ...suffers from asthma, as does his 12-year-old daughter. Collie, whose wife gave birth last year to another daughter, worries for his growing family. The air in the neighborhood can be so difficult to breathe that they sometimes have to shut all their windows. The foul-smelling fumes often leave him wheezing, and prone to long spells of coughing.")

15.    PURPA was enacted to overcome the reluctance of traditional electric utilities to purchase power from and to sell power to non-traditional facilities like Plaintiffs'. *Winding Creek*, 932 F.3d at 863 (citing *Indep. Energy Producers Ass'n, Inc. v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 850 (9th Cir. 1994)). PURPA addressed that problem by requiring electric utilities to purchase power from "qualifying small power production facilities," 16 U.S.C. § 824a-3(a), which include facilities designed to produce electricity solely through the use of a renewable fuel source, such as Plaintiffs' facilities. *Winding Creek*, 932 F.3d at 863;  *see also FERC v. Mississippi*, 456 U.S. 742, 760-761, 102 S. Ct. 2126, 72 L. Ed. 2d 532 (1982) ("The statute's substantive provisions require electricity utilities to purchase electricity from, and to sell it to, qualifying cogenerator and small power production facilities."); *Great Divide Wind Farm 2 LLC v. Aguilar*, 405 F. Supp. 3d 1071, 1087-90 (D.N.M. 2019).

16.    Under section 210(a) through (e), 16 U.S.C. § 824a-3(a)-(e), FERC is required to adopt rules governing implementation of PURPA's must-purchase obligation, and to define methods for calculating the avoided-cost rates at which such purchases must occur. Under section 210(f), 16 U.S.C. § 824a-3(f), states are required to enforce PURPA against the utilities they regulate in accordance with the implementation rules adopted by FERC.[7]

---

[7] On July 16, 2020, the FERC issued Order No. 872, 172 FERC ¶ 61,041 (2020), which is a final rule that revises the FERC's regulations under section 210 of PURPA effective December 31, 2020. The changes made by the Order No. 872, if they survive legal challenges, are prospective

17.     The statute also creates a specific structure for enforcement, divided between federal and state courts. PURPA section 210(h)(2), on the one hand, authorizes challenges to state implementation schemes that violate PURPA and FERC's implementation rules, which the courts have generally referred to as "implementation" challenges. *See Great Divide Wind,* 405 F. Supp. 3d at 1091-93. Specifically, as here, an aggrieved party may file a complaint with FERC and, if FERC does not act within sixty days to bring its own enforcement action against the state, the aggrieved party is then authorized to challenge the state's actions in federal district court. 16 U.S.C. § 823a-3(h)(2).

18.     Section 210(g), on the other hand, governs what the courts have generally termed "as applied" challenges. Section 210(g)(2) authorizes "[a]ny person" to bring an action in state court "against any electric utility" to "enforce any requirement established by a state regulatory authority" which includes the VPUC, the Vermont Legislature and the state of Vermont itself. 16 U.S.C. § 823a-3(g)(2). *See Great Divide Wind Farm,* 405 F. Supp. 3d at 1093-96.

**B.     FERC Adopts Rules Setting Requirements for States to Implement PURPA.**

19.     To carry out the statute's directive, FERC enacted regulations requiring that "[e]ach electric utility shall purchase . . . any energy and capacity which is made available from a qualifying facility . . . [d]irectly to the electric utility." 18 C.F.R. § 292.303(a).  A utility's obligation to purchase all output from a qualifying facility is known as a "legally enforceable obligation," or as the Ninth Circuit describes it—PURPA's "must-take" obligation. *See Winding Creek,* 932 F.3d at 865. Once the utility's LEO or "must-take" obligation is triggered, the utility becomes bound to purchase all electricity the qualifying facility produces. *See Order 69,* Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the

---

only and do not affect plaintiffs' rights complained of herein. *See* Order No. 872, 172 FERC ¶ 61,041       at              ¶66        (July        16,         2020)        available        at: https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20200716-3109.

Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214 at 57 (Feb. 25, 1980) (A legally enforceable obligation is created when "*the qualifying facility has agreed to obligate itself to deliver at a future date energy and capacity to the electric utility*.") (emphasis supplied).[8] The LEO concept has been a cornerstone of PURPA since enactment. *See FLS Energy, Inc.*, 157 FERC ¶ 61,211, at P24 (2016) ("The Commission has explained that the term 'legally enforceable obligation' is broader than simply a contract between an electric utility and a QF, and that a state may not limit the methods through which a legally enforceable obligation may be created to only a fully executed contract. . .. The Commission explained in *JD Wind 1 LLC*, 130 FERC ¶ 61,127 (2010), that *the establishment of a legally enforceable obligation turns on the QF's commitment, and not the utility's actions*[.]") (emphasis added) (footnote omitted).

## C.    FERC Sets Forth How to Establish Avoided Costs.

20.    PURPA also directs FERC to promulgate rules ensuring that "in requiring any electric utility to offer to purchase electric energy from any . . . qualifying small power production facility, the rates for such purchase" shall not "exceed[] the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3(b). FERC's regulations carrying out that directive provide that "[r]ates for purchases from new capacity" – that is, from facilities constructed after PURPA's enactment, § 292.304(b)(1) – must be equal to, and not less than, the utility's avoided costs. *Id.* § 292.304(b)(4).

21.    FERC's regulations also detail the methodologies that must be used in determining a utility's avoided costs and provide that the QF has the option to choose which of two methodologies shall be used in calculating the utility's avoided costs. *Id.* § 292.304(d). When a qualifying facility provides "energy or capacity pursuant to a legally enforceable obligation for the

---

[8] Available at https://www.ferc.gov/sites/default/files/2020-04/order-69-and-erratum.pdf (last visited July 19, 2020).

delivery of energy or capacity over a specified term, . . . the rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, be based on either: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.* § 292.304(d)(2) (emphasis added).

22.     The first methodology – "[t]he avoided costs calculated at the time of delivery," *id.* § 292.304(d)(2)(i) – is known in the industry as a "short run avoided cost" ("SRAC") rate, because it can be determined only at the moment that electricity is delivered. Typically, SRAC is calculated on a month-to-month basis and depends in part upon the fluctuating market price of natural gas or coal. The second methodology – "[t]he avoided costs calculated at the time the obligation is incurred," *id.* § 292.304(d)(2)(ii) – is known in the industry as a "long run avoided cost" ("LRAC") rate because it is determined at the time the utility incurs the purchase obligation and is determined for the entire duration of the contract term. A utility's LRAC is typically calculated through the use of a mathematical model that projects the utility's anticipated avoided costs in the future. Here, the Defendants have determined that for each of years 2016 through 2020 that the LRAC rate for solar energy facilities of 2.2 megawatts ("MWs") or less is equal to 13 cents per KWH and is equal to 15.5 cents per KWH for 2015 (the "VPUC LRAC Rate").

23.     Both the "must-take" obligation and avoided-cost rates are federal obligations which can be enforced in state court under section 210(g) of PURPA. 16 U.S.C. §824a-3(g)(2); *FERC v. Mississippi,* 456 U.S. at 760 ("state courts have a unique role in enforcing the body of federal law, . . . the state courts [are] directed to heed the constitutional command that the policy of *the federal Act is the prevailing policy in every state* [] and should be respected accordingly in the courts of the State") (internal citations and quotations omitted) (emphasis added).

**D. Vermont's Implementation of PURPA.**

24.     FERC's PURPA rules, including the requirement that utilities and their purchasing agent honor any LEO to purchase power from a QF, are the baseline PURPA requirements in every state, and require Vermont to enforce those obligations against the utilities it regulates. *FERC v. Mississippi,* 456 U.S. at 760 ("the policy of the federal Act is the prevailing policy in every state.")

25.     The VPUC oversees two types of interstate wholesale electricity programs involving QFs—Vermont's Standard Offer program, which is at issue here, *see*, 30 V.S.A. § 8005a, and VPUC Rule 4.100, which is entitled Small Power Production and Cogeneration.

26.     In 2009 the Vermont Legislature enacted 30 V.S.A. § 8005a establishing the Standard Offer program under which contracts would be issued to renewable energy QF generators for the purchase of electricity from renewable energy projects.  The Standard Offer program requires VEPP to enter into long-term fixed rate contracts for the purchase of electricity and environmental attributes from renewable energy generators that are sized 2.2 MWs or smaller, except a larger limit of 5MWs applies to hydroelectric facilities.  In the case of solar energy facilities, the contract term would be twenty-five years.

27.     Like any utility-type generation project, a small solar QF requires a fixed and predictable stream of income in order to finance construction.  When first implemented, the price paid for each KWH of electricity under the Standard Offer program was set administratively by the VPUC.  The program had an initial capacity of 50MWs.  That capacity was quickly oversubscribed.

28.     In 2012, the Standard Offer capacity was expanded to 127.5 MWs for certain QFs, and was uncapped for other QFs.  The contracts representing the additional 77.5MWs would be given out over a period of 10 years.  The number of contracts that would be issued each year would be capped, initially at 5MWs per year, then 7.5MWs, and finally at 10MWs.

29.     Section 8005a(f)(3) also added in 2012 instructed that, no later than March 1, 2013, for effect on April 1, 2013, the VPUC must develop standard-offer prices based on an avoided-cost methodology. This provision also directs the VPUC to implement a market-based pricing mechanism applicable to renewable energy developer proposals covered by the cap, *if* the VPUC finds the market-based mechanism to be consistent with federal law and the legislative goal of rapid deployment of new renewable resources at the lowest feasible cost. Conversely, the Vermont statute purports to prohibit the use of the VPUC LRAC Rate (which is the rate required by FERC regulations) unless the VPUC affirmatively finds that the use of the market-based mechanism is inconsistent with federal law.

30.     In an order dated March 1, 2013,[9] the VPUC adopted a market-based mechanism under which renewable energy developers would be required to compete against each other for contracts as opposed to having contracts issued based upon avoided costs as determined by the statute. In that March 2013 Order, the VPUC concluded, albeit without much legal analysis, that its adopted market-based mechanism was consistent with federal law.

31.     The Standard Offer is the only program in Vermont for a qualifying facility to obtain the long-term rate to which a qualifying small power producer is entitled under 18 C.F.R. §292.304(d)(2)(ii) for energy produced by a QF. But the Vermont Standard Offer program suffers from the identical illegalities declared unlawful in the Ninth Circuit's recent decision in *Winding Creek*. Just like California's standard offer for facilities 3MWs and under (which was called the Re-MAT), the Vermont Standard Offer requires qualifying small power producers to bid against each other, thereby denying a qualifying small power producer a contract at the avoided cost rate determined by the state commission for its QF (which here is the VPUC LRAC Rate of 13 cents

---

[9] *Order Re Establishment of Standard-Offer Prices and Programmatic Changes to the Standard-Offer Program*, Dockets 7873 and 7874, Order of 3/1/13 (the "March 2013 Order").

per KWH for solar generating facilities for the 2016 through 2020 cycles of the Standard Offer program).

32.     While Vermont's Standard Offer imposes a cap on the amount of capacity available for certain types of facilities, it is uncapped with respect to other types of facilities, and does not require those facilities to compete for a limited supply of contracts.

33.     Under the "must-take" obligation, a qualifying small power producer is legally entitled to contracts for the energy produced by its QF at the relevant KWH rate that was determined by the VPUC to represent the avoided cost rate.

34.     From 2016 to 2020, the VPUC established applicable avoided-cost rates, which is the VPUC LRAC Rate, i.e., 13 cents per KWH over a 25-year term for solar QFs– an avoided cost rate that is not challenged by Plaintiffs.

35.     Section 210(f)(1) of PURPA establishes that the FERC's PURPA rules are the law of each state and, by operation of section 210(f)(1), are a requirement established by a state regulatory authority without any further action.  As the Supreme Court has stated, PURPA "requires electricity utilities to purchase electricity from, and to sell it to, qualifying cogenerator and small power production facilities," and PURPA requires "the state courts . . . to heed the constitutional command that the policy of *the federal Act is the prevailing policy in every state*." *FERC v. Mississippi*, 456 U.S. at 759-60 (internal quotations and citations omitted) (emphasis added).

36.     It is a fundamental element of law that an unlawful provision is void *ab initio* even if a court only declares it so after the fact.  "An [unlawful] act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S. Ct. 1121, 1125, 30 L. Ed. 178 (1886).

37.     Neither VPUC nor VEPP can enforce an illegal cap, an unlawful allocation of limited capacity, or an unlawful restriction on a QF's entitlement to the VPUC LRAC Rate.

38.     Plaintiffs seek simple declaratory and equitable relief that the cap, the market-based mechanism and the unlawful restriction on a qualifying small power producer's entitlement to the VPUC LRAC Rate for energy from its QF violate PURPA, and enjoin further use of those unlawful provisions.

## PARTIES

39.     AFL is a Delaware corporation. AFL is the operator (and was the operator at the time of the FERC Petition) of the following qualifying small power production facility that was in commercial operation at the time that Plaintiffs filed the FERC Petition:

> a.   Sudbury Solar, which is a 2.0MW solar electric facility located in Sudbury, Vermont, FERC QF self-certification docket no. QF13-439.

The FERC Form 556 for Sudbury Solar was filed with the FERC on May 17, 2013, and docketed as QF13-439-000.  A subsequent notice of re-certification was filed on November 9, 2020, effective as of July 15, 2016.  There is an existing Standard Offer contract for Sudbury Solar but at a price less than the then applicable VPUC-determined LRAC rate.  As a result, AFL is earning less revenue than it is otherwise entitled to under federal law. The Sudbury Solar facility entered commercial operation on April 18, 2016.

40.     AFL is the operator (and was the operator at the time of the FERC Petition) of the following qualifying small power production facility that is now in commercial operation:

> a.   Battle Creek Solar, which is a 2.2MW solar electric facility located in Bennington, Vermont, FERC QF self-certification docket no.  QF16-958.

The FERC Form 556 for Battle Creek Solar was filed with the FERC on June 8, 2016, and docketed as QF16-958-000.  A subsequent notice of re-certification was filed on November 9, 2020,

13

effective as of December 6, 2019. There is an existing Standard Offer contract for Battle Creek Solar but at a price less than the then applicable VPUC LRAC Rate. As a result, AFL is earning less revenue than it is otherwise entitled to under federal law. The Battle Creek Solar facility entered commercial operation on September 27, 2019.

41. OCS is a Vermont limited liability company whose sole member is AFL. OCS is a direct owner (and was a direct owner at the time of the FERC Petition), and AFL was and still is an indirect (i.e., upstream) owner, of the following qualifying small power production facilities that were not in commercial operation at the time that Plaintiffs filed the FERC Petition:

   a. Otter Creek Solar 1 (renamed MacKinnon Solar) which is a 2.2MW solar electric facility located in Rutland, Vermont, the FERC Form 556 for which was filed with the FERC on April 30, 2013 and docketed as docket no. QF13-402-000.[10] Subsequent Form 556s updating information were filed on January 15, 2016, and docketed as QF13-402-004, June 10, 2016, and docketed as QF13-402-005, and July 31, 2018 and docketed as QF13-402-007;

   b. Otter Creek Solar 2 (renamed Grey Solar) which is a 2.2MW solar electric facility located in Rutland, Vermont, the FERC Form 556 for which was filed with the FERC on January 15, 2016 and docketed FERC QF self-certification docket no. QF16-356.[11] A subsequent Form 556 updating information was filed on January 28, 2018, and docketed as QF16-356-002.

AFL is an indirect, upstream owner of each QF listed in this paragraph because it is the sole member of OCS. AFL is not listed as an indirect owner on the FERC Form 556 because AFL is

---

[10] Sometimes the Otter Creek Solar 1 project is referred to as Otter Creek 1 Solar. In order to eliminate that type and other confusion with the name, the name has been changed to MacKinnon Solar.

[11] Sometimes the Otter Creek Solar 2 project is referred to as Otter Creek 2 Solar. In order to eliminate that type and other confusion with the name, the name has been changed to Grey Solar.

not an electric utility and the FERC Form 556 only calls for the listing of indirect owners if such owners are a utility.

42.     OCS received a Standard Offer contract for the Otter Creek Solar 1 (renamed MacKinnon Solar) project on August 27, 2018, at a price below what the Defendants determined was the VPUC LRAC Rate. The Defendants directed VEPP to issue a termination notice with immediate effect of that contract on October 17, 2019. The termination is being disputed by OCS. The Otter Creek Solar 1 (renamed MacKinnon Solar) project was resubmitted to the 2020 standard offer procurement by PLH on behalf of AFL and OCS at a price equal to the VPUC LRAC Rate. OCS received a standard offer contract for the Otter Creek Solar 2 (renamed Grey Solar) project on February 3, 2018, at a price below what the Defendants determined was the VPUC LRAC Rate, but did not receive a contract due to the unlawful cap and market-based mechanism. The Defendants directed VEPP to issue a termination notice with immediate effect of that contract on April 22, 2020. The termination is being disputed by OCS. The Otter Creek Solar 2 (renamed Grey Solar) project was resubmitted to the 2020 standard offer procurement by PLH on behalf of AFL and OCS at a price equal to the Defendants' VPUC LRAC Rate but did not receive a contract due to the unlawful cap and market-based mechanism. AFL is the operator of each of the MacKinnon and Grey solar projects.

43.     PLH is a Florida limited liability company that was formerly known as PLH LLC, an Indiana limited liability company. PLH converted its state of organization to Florida and changed its name effective March 3, 2020. Although the conversion was effective as of March 3, 2020, PLH was not notified until after March 19, 2020, that the conversion filing was accepted by the Florida Secretary of State.

44.     PLH submitted on behalf of OCS (as an owner) and AFL (as an owner and operator) of the following qualifying small power production facilities to the 2015 and 2016 Standard Offer

procurements for contracts and were not in commercial operation at the time that Plaintiffs filed the FERC Petition and did not receive contracts due to the unlawful cap and market-based mechanism:

      a. Otter Creek 1 Solar, Otter Creek 2 Solar, Battle Creek 3 Solar, Otter Creek 3 Solar, Sunderland 1 Solar (QF17-15), Sunderland 2 Solar (QF17-16), Sunderland 3 Solar (QF17-17), Weybridge 1 Solar (QF16-1210), Weybridge 2 Solar (QF16-1212). Each of these facilities in this ¶44a are 2.2MWs.  A FERC Form 556 was filed for each facility.

45.    PLH and AFL are the owners of the following qualifying small power production facilities listed in this paragraph that were submitted for contracts by PLH in the 2020 Standard Offer procurement at the Defendants' VPUC LRAC Rate and did not receive contracts:

      a. Kingsley Solar 1 which is a 2.2MW solar electric facility located in Clarendon, Vermont, the FERC Form 556 for which was filed with the FERC on July 21, 2020, and docketed as docket no. QF20-1188;

      b. Kingsley Solar 2 which is a 2.2MW solar electric facility located in Clarendon, Vermont, the FERC Form 556 for which was filed with the FERC on July 21, 2020, and docketed as docket no. QF20-1189;

      c. Greenbanks Hollow Solar 1 which is a 2.2MW solar electric facility located in Danville, Vermont, the FERC Form 556 for which was filed with the FERC on July 21, 2020, and docketed as docket no. QF20-1183;

      d. Greenbanks Hollow Solar 2 which is a 2.2MW solar electric facility located in Danville, Vermont, the FERC Form 556 for which was filed with the FERC on July 21, 2020, and docketed as docket no. QF20-1184;

e.  Greenbush Solar which is a 2.2MW solar electric facility located in Ferrisburgh, Vermont, the FERC Form 556 for which was filed with the FERC on July 21, 2020, and docketed as docket no. QF20-1185;

f.  Hawkins Solar which is a 2.2MW solar electric facility located in Ferrisburgh, Vermont, the FERC Form 556 for which was filed with the FERC on July 21, 2020, and docketed as docket no. QF20-1188;

AFL is the operator of each of the six facilities listed in this ¶45. On July 1, 2020, PLH submitted a commitment to VEPP to sell all the energy and capacity from these six QFs, each with a nameplate capacity of 2.2MWs, and each at the VPUC LRAC Rate. VEPP would have executed the contracts for those six facilities but for a quantitative cap on the number of contracts under the Standard Offer program imposed on developers for their small solar electric facilities.

46.  By unconditionally committing to sell the output to VEPP on those standard terms on behalf of itself, AFL and OCS for the eight QFs submitted in the 2020 Standard Offer procurement, a "Legally Enforceable Obligation" ("LEO") under section 210 of PURPA was created. VEPP would have also executed at least some of the contracts for those eight facilities if it were not for the unlawful market-based pricing mechanism that the VPUC uses to ranks how the contract capacity made available is distributed.

47.  PURPA defines a "qualifying small power production facility" as "a small power production facility that the Commission [*i.e.*, FERC] determines, by rule, meets such requirements . . . as the Commission may, by rule, prescribe." 16 U.S.C. § 796(17)(C). PURPA defines the type of facility that is a "small power production facility": it "(i) produces electric energy solely by the use ... of ... renewable resources" and "(ii) has a power production capacity... not greater than 80 megawatts." 16 U.S.C. § 796(17)(A).

48.     FERC has adopted regulations setting forth a definition of "qualifying small power production facility." These regulations provide that "a small power production facility is a qualifying facility if it: (1) Meets the maximum size criteria ...; (2) Meets the fuel use criteria ...; and (3) ... has filed with the Commission a notice of self-certification, pursuant to § 292.207(a); or has filed with the Commission an application for Commission certification, pursuant to § 292.207(b)(1), that has been granted." 18 C.F.R. § 292.203(a). The self-certification process referred to in Section 292.203(a) is set forth in 18 C.F.R. § 292.207(a). FERC has provided that "[t]he qualifying facility status of an existing or a proposed facility that meets the requirements of § 292.203 may be self-certified by the owner or operator of the facility" by submitting a particular form. 18 C.F.R. § 292.207(a).

49.     Each of the facilities listed in ¶39a, ¶40a, ¶41a, ¶41b, ¶44a and ¶45a-f is a "qualifying small power production facility" pursuant to 18 C.F.R. § 292.203(a) because (1) it meets the maximum size criteria (they are all under 5 megawatts, less than the 80 megawatt maximum); (2) they each meet the fuel use criteria (each is designed to generate electric energy solely by the use of solar photovoltaic cells, which is a form of renewable energy); and (3) each owner or operator, one of more of the Plaintiffs, filed with FERC a notice of self certification, pursuant to § 292.207(a), stating that each facility meets the requirements of § 292.203. *See* FERC Docket Numbers cited above.

50.     As a result, each of the facilities listed in ¶39a, ¶40a, ¶41a, ¶41b, ¶44a and ¶45a-f are qualifying small power production facilities under PURPA and the FERC's PURPA regulations, and the respective owners and operators of those facilities are qualifying small power producers.

51.     Under 18 C.F.R. § 292.207(a), a "proposed facility" is expressly permitted to self-certify as a "qualifying facility" by filing Form 556. As explained in *Winding Creek Solar LLC v.*

*Peevey*, Case No. 13-cv-04934-JD, 2015 WL 675388, 2015 U.S. Dist. LEXIS 18887 (N.D. Cal. February 17, 2015) a qualifying small power production facility includes un-built facilities that meet the renewable source, size and self-certification requirements, which are all met here for facilities not yet built. The FERC Form 556 requires the operator of the un-built facility to be listed, and FERC's regulations permit the "operator" of an un-built facility to file the Form 556 in order to obtain PURPA benefits. *See*, 18 C.F.R. § 292.207 "Procedures for obtaining qualifying status. (a) Self-certification. The qualifying facility status of an existing or a proposed facility that meets the requirements of § 292.203 may be self-certified by the owner or operator of the facility or its representative by properly completing a Form No. 556 and filing that form with the Commission, pursuant to § 131.80 of this chapter, and complying with paragraph (c) of this section."

52.     Each un-built facility has an operator and an owner, either one of which is entitled to file Form 556 to obtain QF status.

53.     Defendant Anthony Roisman is Chair of the VPUC and is sued in his official capacity.

54.     Defendant Sarah Hofmann is Commissioner of the VPUC and is sued in her official capacity.

55.     Defendant Margaret Cheney is Commissioner of the VPUC and is sued in her official capacity.

## JURISDICTION AND VENUE

56.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action brings claims arising under federal law.

57.     This Court also has subject matter jurisdiction over this action because, under 16 U.S.C. § 824a-3(h)(2)(B), a "qualifying small power producer," after first petitioning FERC, may

bring an enforcement action in a United States district court against a State regulatory authority to enjoin violations of, and ensure compliance with, PURPA and FERC's regulations promulgated pursuant to PURPA.

58.     A "qualifying small power producer" is statutorily defined as "the owner or operator of a qualifying small power production facility." 16 U.S.C. § 796(17)(D).

59.     AFL is a "qualifying small power producer" because it is the operator of the QFs listed in ¶39a, ¶40a, ¶41a, ¶41b, ¶44a and ¶45a-f.   AFL is a "qualifying small power producer" because it is an owner (direct or upstream) of the QFs listed ¶39a, ¶40a, ¶41a, ¶41b, ¶44a and ¶45a-f. OCS is a "qualifying small power producer" because it is an owner of the QFs listed in ¶41a and ¶41b. PLH is a "qualifying small power producer" because it is an owner of the QFs listed in ¶45a-f.

60.     The Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

61.     This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C § 2202; Rule 65 of the Federal Rules of Civil Procedure; and *Ex Parte Young*, 209 U.S. 123 (1908).

62.     This Court is empowered to grant injunctive relief *and all other appropriate relief* under PURPA section 210(h)(2)(B).

63.     This Court has personal jurisdiction over Defendants because each Defendant conducts a substantial portion of his or her duties as an officer of VPUC in the District of Vermont. VPUC is located at 112 State Street, Montpelier, VT  05620.

64.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Vermont.

## INJURIES TO BE REDRESSED

65.     Each Plaintiff has suffered an injury-in-fact because of the cap and the pricing mechanism that restricts the right to a contract with VEPP and because of the restriction on a QF's entitlement to the applicable VPUC LRAC Rate.    As a result, each Plaintiff has been denied the opportunity to enter into a contract with VEPP on terms consistent with federal law. *See Clinton v. City of New York*, 524 U.S. 417, 433 (1998) ("denial of a benefit in the bargaining process can itself create an Article III injury," regardless of whether the bidder would ultimately have won the procurement.)

66.     Plaintiffs have suffered monetary losses incurred in developing QF projects because those projects cannot be constructed and financed without the contracts to which the Plaintiffs are entitled to under PURPA. Without the opportunity to enter into a contract with VEPP on terms required by federal law at the VPUC LRAC Rate, the Plaintiffs will also suffer lost revenue and profits.

67.     A favorable ruling in Plaintiffs' favor, declaring the cap and market-based pricing mechanism and the restriction on a qualifying small power producer's entitlement to the VPUC LRAC Rate for energy from a QF to be preempted and requiring Vermont and the VPUC to implement PURPA in a manner consistent with federal regulations concerning pricing and availability, would redress those injuries-in-fact, by providing the Plaintiffs with the opportunity to enter into a contract with VEPP on terms required by federal law at the VPUC LRAC Rate and enabling them to build, finance and construct their currently unconstructed facilities as well as additional solar projects.

68.     A favorable ruling in Plaintiffs' favor declaring invalid the market-based pricing mechanism and the restriction on a qualifying small power producer's entitlement to the VPUC LRAC Rate for energy from its QF will also allow the Plaintiffs to go to Vermont state court under

16 U.S.C. §824a-3(g) to have the price in Standard Offer contracts adjusted upward to the proper VPUC LRAC Rate in effect at the time of the contract because there too the Plaintiffs have suffered and continue to suffer an injury-in-fact from lost profits in the past and in the future due to the unlawful market-based pricing mechanism and the restriction on a qualifying small power producer's entitlement to the VPUC LRAC Rate for energy from its QF.

69.     Each Plaintiff has also suffered an injury-in-fact because at the current prices set by the Defendants' market-based mechanism, the Plaintiffs would not be able to build their projects or future projects, resulting in lost revenue and profits.

70.     A favorable ruling in Plaintiffs' favor, declaring the cap and market-based pricing mechanism and the restriction on a qualifying small power producer's entitlement to the VPUC LRAC Rate to be preempted and requiring VPUC to implement PURPA in a manner consistent with federal regulations concerning pricing and availability, is, on information and belief, substantially likely to result in a price high enough to allow Plaintiffs to obtain the financing needed to construct its QFs and future QFs that they or one of them would develop, own and/or operate in Vermont.

71.     To establish Article III standing, Plaintiffs must demonstrate "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

72.     Congress and FERC have created a framework for the Nation's wholesale electricity markets in the FPA and PURPA. Broadly speaking there are two categories of electric

generators in the Nation's electricity markets—generators that meet the design standards to be a QF, and those that do not. Those generators that do not meet the design standards for QFs must compete in the regional FERC-approved wholesale energy and capacity markets. Generators that do meet Congress' QF design standards may compete in those regional markets as well, but they also have special rights and favored status. As relevant here, Congress has relaxed the complete ban on State involvement in wholesale electricity markets and has given States the right to promote QF generation by compelling electric utilities to enter into long-term wholesale sales contracts with QFs, such as what Vermont does with its Standard Offer program.

73.   Like any market construct, the rules of the market are intended to send signals to investors. *PPL EnergyPlus LLC v. Nazarian*, 974 F. Supp. 2d 790, 813 (D. Md. 2013) (the rules that govern the energy markets send "long-term price signals ... designed to stimulate investment.") For QF developers like Plaintiffs, those market signals encourage QF developers to invest money in developing QFs. For States that are interested in pursuing a specific renewable energy policy, QF market participants know that States may only compel such wholesale sales with QF generation. That results, as here, with QF developers such as Plaintiffs investing money in developing QF projects in Vermont.

74.   "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("*Spokeo*") (internal quotations and citations omitted.) That is what Congress has done in section 210(h)(2) of PURPA. The Nation's energy markets are complex and interstate. Congress defined the injury, and based upon its judgment of the working of the Nation's energy markets also defined those that have a concrete and particularized stake—qualifying small power producers, electric utilities and qualifying cogenerators. Congress also prescribed the redress that would remedy the injury by authorizing the district court to enjoin the offending

actions and provide other appropriate relief. "Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo*, 136 S. Ct. at 1549.

75.     It is therefore clear that Plaintiffs' harms are far more than a "bare procedural violation" such as an incorrect zip code in a credit report discussed in *Spokeo*. 136 S. Ct. at 1550. Unlike *Spokeo* where the Court could "not imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm," *id.*, it is easy to imagine how the specific market participants identified by Congress plausibly suffer concrete and particularized harm when a State takes unlawful actions related to the energy markets, especially so when Plaintiffs allege specific economic harms.   Moreover, the mere "risk of real harm [can] satisfy the requirements of concreteness," *Spokeo*, 136 S. Ct. at 1549, and there are situations where no additional harm needs to be shown beyond the intangible harm identified in a statute. *Id.* citing *FEC v. Akins*, 524 U. S. 11, 20–25 (1998) and *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989).   Plaintiffs easily satisfy that standard.

76.     Courts have repeatedly found that market participants possess standing under the FPA and similar regulatory schemes. *See, e.g. PPL EnergyPlus LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014) *aff'd sub. nom. Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), *PPL EnergyPlus LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) *cert. den.* 136 S. Ct. 1728 (2016), *La. Energy & Power Authority v. FERC*, 141 F.3d 364, 367 n.5 (D.C. Cir. 1998) (citing cases). Similarly, in determining who may seek review of FERC orders in violation of the FPA, the Second Circuit has taken an extremely expansive view going as far as to hold that plaintiffs pursuing *non-economic* interests may bring suit to enforce the FPA. *Scenic Hudson Preservation Conference v.*

*FPC*, 354 F.2d 608, 615-16 (2d Cir. 1965). In a PURPA section 210(h)(2) action the rules under PURPA are treated as rules under the FPA.

## CLAIM FOR RELIEF

## COUNT I: PREEMPTION
### (Violation of the Supremacy Clause of the U.S. Constitution)

77.     Plaintiffs restate and incorporate by reference each and every allegation in Paragraphs 1 through 76 as if fully set forth herein.

78.     Under the Supremacy Clause of the United States Constitution, a state law or regulation is preempted when Congress intends federal law to occupy the field, as well as in cases where the state law conflicts with federal statutes or regulations, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

79.     Under the Supremacy Clause, state laws or regulatory orders that conflict with federal law or that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), are preempted and invalid. *See Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983) ("Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."). Federal regulations with the force of law have the same preemptive power as a federal statute. *City of N.Y. v. FCC*, 486 U.S. 57, 63-64 (1988).

80.     In passing the FPA, Congress intended FERC to have exclusive jurisdiction over the field of wholesale electricity sales. Section 201(b) of the FPA, codified at 16 U.S.C. § 824(b), sets out the scope of federal regulatory power and draws a bright line between mutually exclusive spheres of state and federal regulatory authority. The FPA left no power in states to regulate wholesale electricity pricing or sales. *See also, Allco Finance Ltd. v. Klee*, 805 F.3d 89, 91 (2nd

Cir. 2015) ("States may not act in [wholesale sale of electricity] this area unless Congress creates an exception. *Id.* § 824(b).")

81.     In 1978, Congress enacted section 210 of PURPA, codified at 16 U.S.C. § 824a-3, which created a limited role for States in regulating certain wholesale transactions.

82.     Other than the authority granted to the States in PURPA, States have no other authority to set wholesale electricity rates or regulate wholesale electricity transactions.

83.     In *California Pub. Utils. Comm'n*, 132 FERC P61,047 (2010) at ¶64, the FERC restated those principles as applied to wholesale sales of electricity:

> The Commission's authority under the FPA includes the exclusive jurisdiction to regulate the rates, terms and conditions of sales for resale of electric energy in interstate commerce by public utilities. [*citing* 16 U.S.C. §§ 824, 824d, 824e; *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)]. While Congress has authorized a role for States in setting wholesale rates under PURPA, *Congress has not authorized other opportunities for States to set rates for wholesale sales in interstate commerce by public utilities, or indicated that the Commission's actions or inactions can give States this authority.* . . . .

(Emphasis added.)

84.     Because a State's *only* authority to regulate wholesale electricity sales is derived from section 210 of PURPA, any State rule that conflicts with those requirements is necessarily preempted. The FERC's regulations provide that a QF has three different bases on which it can compel the sale of its energy and capacity:

> a. an energy only sale without a contract, in which case the QF is paid an as-available rate, *see*, 18 C.F.R § 292.304(d)(1);
>
> b. an energy and/or capacity sale over a specified term that the QF commits to at an as-available avoided cost rate at the time of delivery, *see,* 18 C.F.R § 292.304(d)(2)(i); or
>
> c. an energy and/or capacity sale over a specified term that the QF commits to at the long-term forecasted avoided cost rate at the time the QF commits, *see*, 18 C.F.R § 292.304(d)(2)(ii).

85.     The FERC's regulations do not allow a utility or a State commission to pick which choice applies to a QF.  Rather, it is the qualifying small power producer that has the right to

choose the rate. *JD Wind 1 LLC*, 130 FERC ¶61,127 (2010) at P23. Any rules established by Vermont must not conflict with that requirement. Any rules established by the Defendants must also be just, reasonable, and not unduly discriminatory or preferential. 16 U.S.C. § 824d, 824e. Thus, if Vermont establishes an avoided cost calculation for QF solar generators 2.2MWs and under, such as under the Standard Offer program, PURPA requires that it be offered to all such generators without discrimination.

86.     PURPA directed FERC to adopt rules requiring electric utilities to purchase power generated by, among others, "qualifying small power production facilities." 16 U.S.C. § 824a-3(a). PURPA then directed state regulatory commissions, like the VPUC, to implement FERC's regulations. *"[T]he federal Act is the prevailing policy in every state." FERC v. Mississippi,* 456 U.S. at 760.

87.     Both the volume cap and the VPUC's market-based mechanism, which requires qualifying small power producers to bid against each other violate PURPA. In *Winding Creek*, the District Court for the Northern District of California and the Ninth Circuit Court of Appeals invalidated the exact market-based mechanism—one that requires a bidder to "bid to develop a project based upon its own cost structure." In California that bidder-based cost structure mechanism was called the Re-MAT program and was held to be inconsistent with federal law.

88.     The way the Defendants administer the Standard Offer program is inconsistent with FERC's regulations under PURPA because it limits the utilities' total obligation to purchase electricity – in the case of VEPP as agent of the Vermont utilities, the VPUC limits that total obligation to less than 8MWs per year for facilities owned by independent developers. The VPUC further limits VEPP's total obligation to purchase electricity from different kinds of generation facilities. These limitations on the utilities' purchase obligations conflict with FERC's regulation requiring that "[e]ach electric utility *shall purchase … any* energy and capacity which is made

available from a qualifying facility." 18 C.F.R. § 292.303(a) (emphasis added). Accordingly, the Standard Offer program's limitation on VEPP's purchase obligation as agent for the utilities' is preempted.

89.     Under FERC's regulations, the rate for purchases shall be equal to the utility's avoided costs, 18 C.F.R. § 292.304, and the qualifying facility has the option of choosing from two different ways of calculating avoided costs: "(i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.* § 292.304(d)(2).

90.     VPUC's Standard Offer program purports to implement the second method, the avoided costs calculated at the time the obligation is incurred by calculating what that avoided cost price is, here the VPUC LRAC Rate. But instead of offering that avoided cost price to all qualifying small power producers on a nondiscriminatory basis, the VPUC requires a qualifying small power producer to propose a lower price. That type of downward-spiral pricing mechanism is not based on the *utilities' avoided* costs. Instead, it is intended to reflect the *qualifying facility's production* costs.

91.     Because the Defendants' Standard Offer pricing mechanism results in prices for electricity that do not reflect the utilities' avoided costs, it conflicts with federal regulations for that reason too. *See Indep. Energy Producers*, 36 F.3d at 857 ("[FERC]'s regulations are clear that the rate to be paid by utilities for electric energy be determined according to the avoided costs to the *utility* of generating that energy or purchasing it elsewhere, and not according to the [qualifying facility's] efficiency."). Therefore, the Defendants' market-based pricing mechanism is preempted.

92.     The Vermont statute's restriction on a QF's entitlement to the VPUC LRAC Rate unless the VPUC affirmatively decides that the VPUC's market-based mechanism is also

inconsistent with federal law and thus is pre-empted because it stands as an obstacle and imposes an unlawful condition on a qualifying small power producer's access to the VPUC LRAC Rate to which a QF is entitled to under PURPA.

93.     The discriminatory quantity cap imposed by the VPUC's administration of the Standard Offer program is plainly unlawful under PURPA and thus pre-empted. *See, Winding Creek.,* 932 F.3d at 865 (a "cap on the amount of energy utilities must purchase from QFs is impermissible under PURPA's must-take provision. [With a cap], a utility could purchase less energy than a QF makes available, an outcome forbidden by PURPA.").

94.     Moreover, because the VPUC's market-based pricing mechanism and cap and the restriction on the access to the VPUC LRAC Rate are not authorized by PURPA, they fall outside the narrow exception that Congress has given to States to set rates for wholesale electricity sales. Except for the authority granted by PURPA, States are without power to set rates for wholesale electricity sales; the field of wholesale rate-setting is, with the exception of PURPA, reserved exclusively for FERC. For that reason, too, the VPUC pricing mechanism and cap and restriction on access to the VPUC LRAC Rate are preempted.

95.     Because the VPUC's administration of the Standard Offer program conflicts with federal regulations under PURPA and are an obstacle to the achievement of Congress' policy in enacting PURPA, and because the VPUC has no authority to set wholesale electricity rates or regulate wholesale electricity transactions other than that given by PURPA, the Defendants' administration of the Standard Offer program implementing the market-based mechanism, imposing caps on the availability of contracts, and the restriction on the access to the VPUC LRAC Rate for solar facilities is preempted by federal law and violates the Supremacy Clause of the U.S Constitution.

96.     Under PURPA, it is TRUE that there can be no cap on the "must-take" obligation. All energy offered and made available by a QF must be contracted for. *Winding Creek* at 865. But the Defendants' reverse auction mechanism requires that proposition to be FALSE. That is because the reverse auction *only* serves its intended purpose (*i.e.*, setting a price below avoided costs) if capacity is capped or limited, thus forcing qualifying small power producers to compete against each other. If there can be no cap as *Winding Creek* confirms, then the reverse auction does not, and cannot, function because qualifying small power producers are not required to compete, resulting in all qualifying small power producers bidding at the ratepayer-neutral avoided cost price determined by the Defendants.

97.     The Vermont Standard Offer market-based mechanism also does not comply with PURPA, because the price it offers is not based on the costs *the utility* would incur but for its purchase from qualifying small power producer. Instead, the Vermont Standard Offer market-based mechanism price is based on the price at which qualifying small power producers are willing to sell, which is the same type of market-based mechanism invalidated by the Ninth Circuit in *Winding Creek*. As *Winding Creek* plainly shows, the reverse auction pricing scheme is fundamentally based upon *ignoring* the "must take" obligation. If two qualifying small power producers offer all their energy from QFs, the utilities must-take all the energy made available from *both* QFs. But the reverse auction ignores that rule by saying the utility is only buying from one QF.

98.     Plaintiffs will suffer irreparable harm by virtue of Vermont's and the VPUC's violation of the Supremacy Clause, because they will continue to be unable to enter into contracts at the long-run avoided cost price guaranteed by federal law, and are without any adequate remedy at law and no opportunity for compensation for Vermont's and the VPUC's violation of the Supremacy Clause.

99.    The public interest is also harmed by Vermont's and the VPUC's violation of federal law. Congress and FERC have determined that the public interest lies in encouraging the development of renewable energy generation, so long as consumers do not pay more for renewable energy generation than they would for the electricity that would otherwise need to be produced, which here the VPUC LRAC Rate.

100.    Plaintiffs are entitled to judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the market-based mechanism, quantity caps and restriction on access to VPUC LRAC Rate for solar QFs violates the Supremacy Clause (Article VI, Clause 2) of the United States Constitution.

101.    Plaintiffs are entitled to injunctive relief preventing Defendants from continuing to carry out their unlawful administration of the Standard Offer program, and requiring the Defendants to administer the Standard Offer program without the market-based mechanism, and without the imposition of discriminatory caps and other restrictions that have prevented Plaintiffs' QF facilities from receiving contracts with VEPP at the VPUC LRAC Rate in effect at the time under the Standard Offer program.

102.    Such injunctive relief would harm Defendants less (if at all) than denying relief would harm to Plaintiffs.

103.    In the words of Judge Donato of the Northern District of California from the *Winding Creek* case, the path to compliance is an "easy fix":

> THE COURT: I am wanting to hear from the CPUC. What are you doing with Re-MAT? I mean, freezing it and then just not doing anything is sort of creating your own harm. So, what is the PUC doing to make Re-MAT PURPA-compliant? It's not that hard, okay? I mean, the order was relatively straightforward, as I said. There's a megawatt cap that didn't stand. Seems to me, an easy fix. You just don't have the megawatt cap."

*Winding Creek Solar LLC v. Peevey*, No. 13-cv-04934-JD (N.D. Cal. February 8, 2018) (Dkt. No. 196 at 8).

104.    The fix here is easy too. The cap and market-based mechanism and other restrictions that prevent VEPP from executing contracts with Plaintiffs at VPUC LRAC Rate cannot stand and the fix is to have VEPP enter into those contracts at the VPUC LRAC Rate and to correct the contracts for projects that already have contracts to the applicable VPUC LRAC Rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an Order:

a.      Declaring that the Defendants' market-based mechanism and the quantitative caps on of the Standard Offer program, and the restriction on the access to the VPUC LRAC Rate for solar facilities is preempted by federal law and violates the Supremacy Clause of the U.S Constitution insofar as they place numerical limits on VEPP's obligations to enter into contracts purchasing electricity produced by solar electric qualifying facilities;

b.      Declaring that the Defendants' market-based mechanism and the quantitative caps of the Standard Offer program as they relate to solar electric facilities, and the restriction on the access to the VPUC LRAC Rate for solar facilities is preempted by federal law and violates the Supremacy Clause of the U.S Constitution insofar as they establish a price different than the VPUC LRAC Rate for the solar facilities;

c.      Declaring that the Defendants' conditioning Plaintiffs ability to enter into contracts with VEPP for energy produced by their solar electric qualifying facilities at a price lower than the then applicable VPUC LRAC Rate for solar facilities was and is unlawful under PURPA;

d.      Declaring that the Vermont statute's prohibition on the use of the VPUC LRAC Rate for solar QFs unless the VPUC affirmatively finds that the use of the market-

32

based mechanism is inconsistent with federal law violates the Supremacy Clause of the U.S. Constitution;

e. Enjoining Defendants from continuing to apply the VPUC's market-based mechanism and quantitative caps with respect to solar electric qualifying facilities;

f. Enjoining Defendants from continuing to apply any restriction that prevents access to the VPUC LRAC Rate for Plaintiffs' solar QF facilities sized 2.2MWs or less;

g. Enjoining Defendants to issue new orders requiring the VPUC to implement PURPA in a manner consistent with federal law;

h. Enjoining Defendants from awarding and/or approving and/or executing interstate wholesale electricity contracts in connection with their current Standard Offer energy solicitation using the market-based mechanism; and

i. Awarding Plaintiffs such further relief as the Court may deem just and equitable.

Dated: November 9, 2020

Respectfully submitted,

Thomas Melone
Allco Renewable Energy Limited
601 S Ocean Blvd.
Delray Beach, FL 33483
Phone: (212) 681-1120
Email: Thomas.Melone@AllcoUS.com

*Attorney for Plaintiff*