## UNITED STATES DISTRICT COURT

## DISTRICT OF VERMONT

| | |
|---|---|
| ALLCO FINANCE LIMITED, OTTER CREEK SOLAR LLC and PLH VINEYARD SKY LLC | Case No.  2:20-cv-00103-cr |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| ANTHONY ROISMAN, SARAH HOFMANN and MARGARET CHENEY, in their official capacities as commissioners of the Vermont Public Utility Commission. | |
| Defendants**.** | |

The Defendants' various arguments in their motion to dismiss cannot overcome the fact that Plaintiff Allco Finance Limited ("AFL") is the operator of operating qualifying facilities ("QFs").[1]  As a result, AFL is undeniably a qualifying small power producer ("QSPP").  *See,* 16 U.S.C. §796(17)(D),[2] *see also, Allco Finance Ltd. v Klee*, 805 F.3d 89, 96 (2d Cir. 2015) ("As Allco acknowledges, its 'status as a small power producer' under PURPA 'is relevant to [its] Article III standing and to explain[ing] why [its] injury is redressable.'")[3] As a QSPP, AFL is authorized by Congress to bring an action in this Court to challenge the Defendants' implementation of section 210 of PURPA.  *See*, 16 U.S.C. §824a-3(h)(2).  *See also, Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("*Spokeo*") ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.") (internal quotations and citations omitted.)  That is

---

[1] "[Q]ualifying small power production facilit[ies]" under the statute and "Qualifying Facilities" or QFs under FERC's regulations, *see* 16 U.S.C. § 796(17)(C); 18 C.F.R. § 292.203).

[2] A "qualifying small power producer" means the owner *or* operator of a qualifying small power production facility. 16 U.S.C. §796(17)(D).

[3] In the case of Plaintiff AFL, two decisions of the Second Circuit have accepted AFL's status as a QSPP.  *Allco Finance Ltd. v Klee*, 805 F.3d 89 (2d Cir. 2015) and *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017).

what Congress has done in section 210(h)(2) of the Public Utility Regulatory Policies Act, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA") based upon its judgment of the working of the Nation's complex and interstate energy markets.  Defendants' arguments conflate a QF (which is not a person and is not authorized to bring suit or exhaust remedies), with a QSPP, which is.  This Court does not need to address any other of Defendants' arguments because AFL's status as a QSPP (acknowledged by the Second Circuit) entitles AFL to a decision on the merits of the implementation challenge.

## BACKGROUND

On October 20, 2020, this Court issued an order for the Plaintiffs to show cause why this case should not be dismissed for lack of subject matter jurisdiction, ECF No. 19 (the "Order").  The Order identified two jurisdictional issues with Plaintiffs' original complaint.[4] The first issue related to the Plaintiffs' qualification as a QSPP under 16 U.S.C. §796(17)(D). The second issue related to satisfaction of the exhaustion requirement of 16 U.S.C. § 824a-3(h)(2)(B).  Pursuant to Fed. R. Civ. Proc. 15(a)(1)(B), the Plaintiffs filed the first amended complaint ("FAC") on November 12, 2020, ECF No. 23.  The FAC resolved those issues. Plaintiffs incorporate by reference, pursuant to F.R.C.P. 10(c), their memorandum of law in response to the Court's order to show cause (ECF No. 22).

The FAC establishes the basis for each Plaintiff's status as a QSPP, and simplifies the number of QFs at issue in the complaint in order to address the merits of the action, while correcting the noted factual deficiencies.  The FAC also establishes that the Plaintiffs' PURPA

---

[4] For commentary on the Order *see*, Jennifer L. Key, Steptoe & Johnson LLP, "*The Vermont PUC Takes a Stance Against FERC Jurisdiction Over Wholesale Power Sales From Distributed Resources*"  November  1,  2020,  available  at: https://www.lexology.com/library/detail.aspx?g=247b37c9-8b4d-49b3-976b-81b32199b7a1.

implementation challenge is based upon the same infirmities in the Vermont standard offer program that existed when the Plaintiffs filed their petition for enforcement (the "FERC Petition") with the Federal Energy Regulatory Commission ("FERC"), and that the FERC was presented with all the relevant legal issues presented in the FAC regarding Plaintiffs' implementation challenge.[5]

## I.     Plaintiffs Have Standing To Bring Their Claims.

To establish Article III standing, Plaintiffs must demonstrate "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."  *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

### A.  Congress Provided Standing In 16 U.S.C. §824a-3(h)(2).

Congress and FERC have created a framework for the Nation's wholesale electricity

---

[5] The Order (at 5) cites from *FERC v. Mississippi,* 456 U.S. 742, 767 (1982) stating that "PURPA 'establishes a program of cooperative federalism that allows States, within limits established by federal minimum standards, to enact and administer their own regulatory programs structured to meet their own particular needs.'"  But that quote is from the Supreme Court's discussion of Titles I and III of PURPA, not Title II, which is at issue here.  As the Ninth Circuit observed "Title II of PURPA, the statutory section in question in this case, establishes a distinctly different federal-state relationship from those established in Titles I & III." *Indep. Energy Producers Ass'n v. California Pub. Utils. Comm'n,* 36 F.3d 848, 857, fn. 14 (9th Cir. 1994). *See also*, *Wheelabrator Lisbon, Inc. v. Conn. DPUC*, 53 F.3d 183, 188 (2d Cir. 2008) ("under the PURPA regulatory regime, FERC—and not state agencies—[are] responsible for regulating the rates charged by qualifying facilities in power purchase agreements.")  The Order also states that "PURPA [is] an amendment to the FPA." Section 210 of PURPA is not part of the Federal Power Act. *See Midland Power Co-op. v. FERC* 774 F.3d 1, 3 (D.C. Cir. 2014) ("[A]s enacted in the Statutes at Large, § 313 uses the word 'Act' where the codifiers used the word 'chapter.' See 49 Stat. 860 ('Any party to a proceeding under this Act aggrieved by an order . . .'). In cases, like this, where the two versions conflict, the rule is that the Statutes at Large version controls.")

markets in the Federal Power Act ("FPA"), 16 U.S.C. §791a *et seq*., and section 210 of PURPA. Broadly speaking, there are two categories of electric generators in the Nation's electricity markets—generators that meet the design standards to be a QF, and those that do not. Those generators that do not meet the design standards for QFs must compete in the regional FERC-approved wholesale energy and capacity markets. Generators that do meet Congress' QF design standards may compete in those regional markets as well, but they also have special rights and favored status. As relevant here, Congress has relaxed the complete ban on State involvement in wholesale electricity markets and has given States the right to *promote QF generation* by compelling electric utilities to enter into long-term wholesale sales contracts with QFs, such as what Vermont proposes to do here.

Like any market construct, the rules of the market are intended to send signals to investors. *PPL EnergyPlus LLC v. Nazarian*, 974 F. Supp. 2d 790, 813 (D. Md. 2013) (the rules that govern the energy markets send "long-term price signals … designed to stimulate investment.") For QF developers like Plaintiffs', those market signals encourage QF developers to seek out opportunities to develop QFs. For States that are interested in pursuing a specific renewable energy policy, QF market participants know that States may only *compel* such wholesale sales with QF generation. That results, as here, with QF developers such as Plaintiffs investing money in developing QF projects and seeking the opportunity to develop QFs in various States under PURPA's "must-take" regime.

"Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo*, 136 S. Ct. 1540, 1549 (2016) (internal quotations and citations omitted.) That is what Congress has done in section 210(h)(2) of PURPA. The Nation's energy markets are complex and interstate. Congress defined the injury,

and based upon its judgment of the working of the Nation's energy markets also defined those that have a concrete and particularized stake—qualifying small power producers, electric utilities and qualifying cogenerators.  Congress also prescribed the redress that would remedy the injury by authorizing the district court to enjoin the offending actions and provide other appropriate relief to restore the opportunities for QSPPs to develop QFs.  "Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo*, 136 S. Ct. at 1549.

Unlike *Spokeo* where the Court could "not imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm," *id.*, it is easy to imagine how the specific market participants identified by Congress *plausibly* suffer concrete and particularized harm when a State takes unlawful actions related to the energy markets, especially so when Plaintiffs have alleged specific economic harms and the reduction in opportunities to develop QFs.  Moreover, the mere "risk of real harm [can] satisfy the requirements of concreteness," *Spokeo,* 136 S. Ct. at 1549, and there are situations, as here, where no additional harm needs to be shown beyond the intangible harm identified in a statute. *Id*. citing *FEC v. Akins,* 524 U. S. 11, 20–25 (1998) and *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989).  Allco easily satisfies that standard.

Although Plaintiffs need not show additional harm beyond the intangible harm identified in a statute, here, it cannot be disputed that the compulsion of wholesale sales based upon a lowest-price bidding construct as opposed to the Congressionally mandated avoided cost price could *plausibly* have an effect on Plaintiffs or their ability to obtain a contract, or *plausibly* affect Plaintiffs' ability and opportunities to develop QFs in Vermont.

**B.  Defendants' Unlawful Implementation Of PURPA Substantially Increases The Potential For Loss Of Eligibility For Publicly Conferred Benefits.**

Just like the like farmers cooperative in *Clinton v. City of New York*, 524 U.S. 417, 433

(1998), the Defendants' unlawful implementation of PURPA substantially increases the potential for loss of eligibility for publicly conferred benefits. Here, those benefits are the Vermont standard offer contracts, the "must-take" PURPA benefits available to owners and operators of QF solar facilities and the special status and preferred rights conferred on QSPPs in order to encourage QSPPs to develop QFs. The inability to obtain the opportunity to benefit from those publicly conferred benefits that aid in the develop of QFs in a State, such as Vermont, is itself a clear injury under *Clinton*.

### C. Plaintiffs Sufficiently Alleged That They Are Each A QSPP Under 16 U.S.C. §796(17)(D).

Section 210(h)(2)(B) of PURPA, 16 U.S.C. § 824a-3(h)(2)(B), authorizes any QSPP to bring an action in the appropriate United States district court to require a State regulatory authority to comply with PURPA's requirements, if such QSPP has first asked the FERC to bring such action and the FERC has failed to do so after 60 days.

For purposes of Defendants' motion, the Plaintiffs sufficiently alleged that each of them is a QSPP. Compl. ¶¶7-8. Moreover, in the case of Plaintiff AFL, two decisions of the Second Circuit have accepted AFL's status as a QSPP. *Allco Finance Ltd. v Klee*, 805 F.3d 89 (2d Cir. 2015) and *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017)

Defendants simply conflate QFs and QSPPs. QFs are not QSPPs. A QF when built is a physical construction. A QF is not a person or an entity and cannot bring suit. A QSPP can own multiple QFs, some built, some not built, or even none built, inside or outside of Vermont. Section 210(h) of PURPA allows a QSPP to challenge a State's implementation of PURPA regardless of the operational, built or un-built status of the QF and regardless of whether the QSPP has QFs in the State whose implementation is being challenged. The mere prospect of opportunity, and desire, to develop QFs if a State's implementation of section 210 of PURPA is corrected is sufficient to

provide standing.

### D.  An Un-Built Facility Qualifies As A QF.

Each of the facilities listed in ¶39a, ¶40a, ¶41a, ¶41b, ¶44a and ¶45a-f of the FAC is a "qualifying small power production facility" pursuant to 18 C.F.R. § 292.203(a) because (1) it meets the maximum size criteria (they are all under 5 megawatts, less than the 80 megawatt maximum); (2) they each meet the fuel use criteria (each is designed to generate electric energy solely by the use of solar photovoltaic cells, which is a form of renewable energy); and (3) each owner or operator filed with FERC a notice of self certification, pursuant to § 292.207(a), stating that each facility meets the requirements of § 292.203.[6]

As a result, each of the facilities listed in ¶39a, ¶40a, ¶41a, ¶41b, ¶44a and ¶45a-f of the FAC are qualifying small power production facilities under PURPA and the FERC's PURPA regulations, and the respective owners and operators of those facilities, AFL, Otter Creek Solar LLC and PLH Vineyard Sky LLC are QSPPs.  But AFL's status as a QSPP does not rise and fall based upon the QFs listed in those paragraphs.  AFL operates QFs throughout the United States (*see, e.g.*, *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017)).  The statement in the Complaint at para. 7 is sufficient to establish AFL's status for purposes of Defendants' motion.

The Order's question regarding the status of an operator of an un-built facility is addressed by 18 C.F.R. § 292.207(a).  Under 18 C.F.R. § 292.207(a), a "proposed facility" is expressly permitted to self-certify as a "qualifying facility" by filing Form 556.  As explained in *Winding Creek Solar LLC v. Peevey*, Case No. 13-cv-04934-JD, 2015 WL 675388, 2015 U.S. Dist. LEXIS

---

[6] The self-certification process referred to in Section 292.203(a) is set forth in 18 C.F.R. § 292.207(a). FERC has provided that "[t]he qualifying facility status of an existing or a proposed facility that meets the requirements of § 292.203 may be self-certified by the owner or operator of the facility" by submitting a particular form. 18 C.F.R. § 292.207(a).

18887 (N.D. Cal. February 17, 2015) a qualifying small power production facility includes un-built facilities that meet the renewable source, size and self-certification requirements, which are all met here for facilities not yet built.  The FERC Form 556 requires the operator of the un-built facility to be listed, and FERC's regulations permit the "operator" of an un-built facility to file the Form 556 in order to obtain PURPA benefits.  *See*, 18 C.F.R. § 292.207 ("Procedures for obtaining qualifying status. (a) Self-certification. The qualifying facility status of an existing *or a proposed facility* that meets the requirements of § 292.203 may be self-certified by the owner or operator of the facility or its representative by properly completing a Form No. 556 and filing that form with the Commission, pursuant to § 131.80 of this chapter, and complying with paragraph (c) of this section.") (emphasis added.)

Each un-built facility has an operator and an owner, either one of which is entitled to file Form 556 to obtain QF status and seek PURPA benefits.

### E.  There Are No Requirements Related To Construction Or Permitting.

The status as a QSPP and as a QF is separate from the issue of whether and when a legally enforceable obligation ("LEO") arises.  It is also separate from whether a QSPP has Article III standing based upon Congress's express grant of standing.  Whether or not a LEO arose with respect to a particular QF does not undermine Congress' express grant of standing to a QSPP to enforce a State's obligation to implement section 210 of PURPA.   Plaintiff AFL is unquestionably a QSPP because it is, as Defendants concede, the operator of built projects.  As such, AFL undeniably has the right to bring an implementation challenge.  Defendants are simply trying to amend Congress' express grant of standing to impose additional requirements related to specific QFs, where Congress chose not to do so.

Moreover, the Standard Offer program's rules do not require any facility to have received

permits, filed an interconnection application, or filed an application for a certificate of public good at the time of a bid submission.  The Standard Offer program's rules do not require the filing of a Form 556 at the time of a bid submission.  Except in an unusual case, all facilities that submit requests for contracts under the Standard Offer program are un-built, "on paper" only facilities. The Defendants' compulsion of wholesale sales is only permissible if it fits within their limited authority under section 210 of PURPA, otherwise it is pre-empted by the FPA.  Defendants' argument seems to challenge the validity of their own program by focusing on the fact that they compel wholesale sales with entities that are not QFs at the time.

Defendants' citation of *S. River Power Partners, L.P. v. Pa. Pub. Util. Comm'n*, 696 A.2d 926, 932 (Pa. Commw. Ct. 1997), *Smith Cogeneration Mgmt., Inc. v. Corp. Comm'n and Pub. Service Co. of Okla*., 863 P.2d 1227 (Okla.1993), *Appeal of Pub. Service Co. of N.H.*, 130 N.H. 285, 539 A.2d 275 (1988) and PUC Rule 4.103(21) are all inapposite.  Whether the Vermont Public Utility Commission ("VPUC") could have adopted a rule that required a certain amount of project development to have been done before a LEO is established is irrelevant to this case because the VPUC adopted no such requirements.  Plaintiffs fulfilled all the requirements set forth by the VPUC to receive standard offer contracts.

But even if the VPUC adopted a rule that restricted the formation of a LEO, such a rule would be relevant to the merits of the remedy, not standing.  *See, Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017), fn. 10.  The same is true with respect to Defendants' reference to the process to obtain a contract under its Rule 4.100 program.  That alternative is irrelevant to standing as the Second Circuit made clear in *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017) at fn. 10.

**F.  There Is No Requirement That Plaintiffs Allege That The Form 556 Was Provided to The Vermont Utilities Or The VPUC.**

Tellingly, the Defendants do not allege that they did not receive a copy for the Form 556s for each facility.[7]  And the Defendants know full well that they received a copy of the Form 556s for the projects that have standard offer contracts because providing a copy of the Form 556 or a link to it is a requirement of Attachment D to the standard offer contract.  Each of the Plaintiffs sufficiently alleged that they were a QSPP. Compl. ¶¶7, 8.

The "underlying purpose of [292.207(e)'s] notice requirements [is] to provide as much notice of new projects as possible to electric utilities with which qualifying facilities interact -- and to the state regulators of those utilities and facilities -- to permit the orderly development of power resources and planning for any necessary transmission facilities." *Power Partners*, 72 F.E.R.C. P61,181, 61,882 (1995).  18 C.F.R. §292.207(e)(2) provides for the consequences of the failure to timely provide notice:

> (2) Facilities of 500 kW or more. An electric utility is not required to purchase electric energy from a facility with a net power production capacity of 500 kW or more until 90 days after the facility notifies the facility that it is a qualifying facility or 90 days after the utility meets the notice requirements in paragraph (c)(1) of this section.

The consequences of the failure to provide timely notice is not the failure of self-certification as a QF.  Rather for Plaintiffs' facilities it would be delay in the actual delivery of energy if notice is never given. 18 C.F.R. §292.207(e)(2). But here, the VPUC and the interconnecting utility had notice from the various proceedings involving Plaintiffs and the Standard Offer procurement.

---

[7] The FERC form 556 contains an acknowledgement that the form 556 has been provided to the relevant utilities as well as the as well as to the regulatory authorities of the states in which the facility and those utilities reside.  *See*, https://www.ferc.gov/media/form-no-556, page 23.

In all the time since PURPA has been enacted, Plaintiffs cannot find a single challenge by either a utility or a state commission based upon the failure to concurrently provide a copy of the Form 556.   Even if the consequences of such failure were more than specified by the rule itself, *see* 18 C.F.R. §292.207(e)(2), at most, providing a copy of the Form 556 is similar to a claims-processing rule that "seek[s] to promote the orderly progress [] by requiring that the parties take certain procedural steps at certain specified times," *Arbaugh v. Y&H Corporation*, 546 U.S. 500, 516 (2006).  In fact, that is what FERC said in *Power Partners, supra*.

"Filing deadlines . . . are quintessential claim-processing rules." *Attipoe v. Barr*, 945 F.3d 76, 81 (2d. Cir. 2019) quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  Here, Defendants do not dispute that they received the copies of 556.  Nor do Defendants claim that they do not have easy and reliable access of the Form 556s on ferc.gov. Nor can Defendants claim that they had no knowledge of Plaintiffs' existing and proposed facilities.

If the Defendants seek to challenge the status of a facility as a QF on the basis of a "material" misrepresentation or that it is unbuilt, then Defendants' must file a motion seeking revocation of QF status, which requires a filing fee as a declaratory order. *Chugach Electric Association, Inc*., 121 FERC P 61,287, at P 51-54 (2007).  The filing fee for a declaratory order is provided in 18 CFR § 381.302.  The filing of the Form 556 with FERC conclusively establishes that the facility is a QF, absent a revocation issued by FERC.

## II.   Plaintiffs Met The Exhaustion Requirements of 16 U.S.C. § 824a-3(h)(2)(B).

16 U.S.C. §824a-3(h)(2)(B) provides that

[a]ny … qualifying small power producer may petition the [FERC] to enforce the requirements of subsection (f) …. If the [FERC] does not initiate an enforcement action … against a State regulatory authority …, the petitioner may bring an action in the appropriate United States district court to require such State regulatory

authority … to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate.

16 U.S.C. §824a-3(h)(2)(B) authorizes a QSPP to bring suit to enforce a State's obligation under 16 U.S.C. §824a-3(f) to implement section 210 of PURPA.  A QSPP means the owner *or* operator of a qualifying small power production facility, such as Plaintiffs. 16 U.S.C. §796(17)(D).  The only condition to bringing suit is that the **_QSPP_** must have petitioned the FERC to bring such action and 60 days have elapsed since the petition, which has been met here.  AFL, OCS and PLH satisfied the administrative exhaustion requirement of 16 U.S.C. § 824a-3(h)(2) by first asking the FERC to bring an action against the VPUC.  AFL, OCS and PLH filed the FERC Petition on November 4, 2016.  FERC issued its notice of intent not to act on January 3, 2017, which declined to initiate its own enforcement action against the VPUC under section 210(h)(2)(a) but authorized Plaintiffs to proceed in federal district court.  *Otter Creek Solar LLC*, 158 FERC ¶ 61,001 (2017).

Defendants again mistakenly confuse QFs with QSPPs.  The implementation challenge here is to a programmatic improper implementation of section 210 of PURPA.  Individual QFs do not exhaust remedies.  QSPPs exhaust remedies, which is what Plaintiffs did.

The Plaintiffs' FERC Petition addressed the exact issues presented here—the unlawfulness of the market-based mechanism, the unlawful caps, and the refusal to issue contracts at the avoided cost price determined by the VPUC.  Those issues are endemic to the Standard Offer program in all years, whether it is 2015, 2016, 2017, 2018, 2019 or 2020.  Plaintiffs were and are owners and operators of QFs and wanted to be participants in a compliant Vermont standard offer program and seek the special opportunities provided by section 210 of PURPA, which are lost to them because of the Defendants' improper implementation challenged in this case.  FERC declined to bring an action, satisfying the exhaustion requirement of 16 U.S.C. § 824a-3(h), and authorizing Plaintiffs to bring such a suit.

The exhaustion requirement under section 210 of PURPA is not the typical exhaustion requirement. As the Court's Order observes at page 25 of the Order:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits). This Court has described the doctrine as follows: [A]s a general rule ... courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice. Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings

quoting *Woodford v. Ngo,* 548 U.S. 81, 90-91 (2006). But none of that rationale applies here. The FERC does not act as an adjudicatory agency. There is no proceeding at the FERC in response to a petition for enforcement. There is no "fair and full opportunity to adjudicate their claims" against a state agency. There is no FERC decision to topple. FERC cannot be hauled into court. Like a *qui tam* suit, the only question is whether the agency wishes to bear the burden of the expense of bringing the suit in federal court. Exhaustion here is not part of the adjudicative process because the FERC does not adjudicate anything.

The two main purposes of exhaustion as described in the Order at page 24 are simply not applicable here. There are no FERC errors to correct. This Court does not and cannot review FERC's decision not to bring an action. No claims can be resolved by the FERC. The claims against the Defendants can only be resolved in this Court. All of the citations in the Order are inapposite because all those cases involve a proceeding before an agency over which the agency had adjudicative authority. That does not exist here.

Even so, as explained in Plaintiffs' memorandum of law in response to the Court's order

to show cause (ECF No. 22), the FERC Petition covered the identical claims brought here.  To be sure the FERC Petition was filed in 2016, but the same challenged provisions continue unaltered in post-2016 years.  *See*, The FERC Petition states at 1:

> This petition challenges several aspects of Vermont's implementation of PURPA, including,
>
> i.  The requirement to participate in a bidding contest to obtain a long-term 25-year wholesale electricity bundled contract;
>
> ii.  Vermont's capacity cap on contracts under its standard offer program;
>
> iii.  The discriminatory treatment of certain QFs by exempting only certain generators from the cap and bidding requirements;
>
> iv.  Vermont's refusal to award contracts at the avoided cost rate Vermont has determined;

Those are the same infirmities challenged in this action.  The FERC Petition further expounded on the challenged aspects of Vermont's Standard Offer—the same ones challenged here. *See*, ECF No. 22 at 6-10 and FERC Petition at 17-18, 27-30.

The aspects of Vermont's Standard Offer program covered in the FERC Petition are the same aspects challenged here.  If a change in calendar years required a re-petition to the FERC listing the same issues, it would impermissibly impose a constant moving target and result in the inability for a QSPP to ever seek relief and obtain a decision.  Moreover, going back to the FERC to re-state the same challenges to the same provisions as was done in the FERC Petition would serve no purpose and would be futile. *NRDC v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (*en banc*), explaining that courts have waived exhaustion where the agency "has had an opportunity to consider the identical issues [presented to the court] . . . but which were raised by other parties," or if the agency's decision indicates that it "had the opportunity to consider the very argument pressed by the petitioner on judicial review." (Internal citations and quotations omitted).

III.    **Plaintiffs Have Plausibly Alleged An Injury Caused By Defendants'
Implementation of PURPA.**

The Defendants argue that with respect to the two QFs that are in commercial operation,
an allegation of injury related to the inability to obtain financing and construct those two facilities
would be implausible.  Def. Memo. At 17.  Plaintiffs agree.  Plaintiffs made no such allegation
with respect to those constructed projects.  *See*, Compl. ¶67 ("A favorable ruling in Plaintiffs'
favor … would redress those injuries-in-fact, by providing the Plaintiffs with the opportunity to
enter into a contract with VEPP on terms required by federal law at the VPUC LRAC Rate and
enabling them to build, finance and construct their currently *unconstructed* facilities as well as
additional solar projects.") (emphasis added.)

The Defendants' argument creates a circularity where no QSPP would have an injury if
some QSPP could build a QF at the lower price created by the auction mechanism.  Such an
approach would involve a fact-finding that would require this Court to predict that a low-bid
project would actually be built.  Such an approach is wholly insistent with standing and involves
a merits determination.  In addition, such an approach would dash the entire scheme that Congress
laid out where a QSPP has an express right of action to launch an implementation challenge against
a State regulatory authority, especially, as here, where the State is taking away the opportunities
Congress intended for QSPPs to encourage development of QFs.  There is no requirement that the
unlawful implementation prevent under all circumstances the ability of every QSPP to build a
specific QF.  That would create an elasticity in the law that would permit certain violations of
section 210 and require this Court to adjudicate how bad the violations were.  But that too would
be a merits issue and not relevant to standing. *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir.
2017) at fn. 10 ("Our threshold inquiry into standing in no way depends on the merits of the
plaintiff's claim. … An injury-in-fact differs from a 'legal interest'; an injury-in-fact need not be

capable of sustaining a valid cause of action.")  (internal citations and quotations omitted).

Plaintiffs alleged that requiring the State to adhere to federal law concerning pricing and availability would provide the Plaintiffs with the opportunity to enter into a contract with VEPP on terms required by federal law at the VPUC LRAC Rate and enable them to build, finance and construct their currently unconstructed facilities as well as develop additional solar projects.

Plaintiffs' harms are far more than a "bare procedural violation" such as an incorrect zip code in a credit report discussed in *Spokeo,* 136 S. Ct. at 1550.  Unlike *Spokeo* where the Court could "not imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm," *id.*, it is easy to imagine how the specific market participants identified by Congress plausibly suffer concrete and particularized harm when a State takes unlawful actions related to the energy markets and energy facilities, especially so when Plaintiffs allege specific economic harms and loss of opportunities.

Plaintiffs' harms are directly caused by the Defendants' improper implementation of section 210 of PURPA and its attempt to regulate wholesale sales outside of its limited authority under section 210 of PURPA.  Courts have repeatedly found that market participants possess standing under the FPA and similar regulatory schemes.  *See, e.g. PPL EnergyPlus LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014) ("*Nazarian*") *aff'd sub. nom. Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) ("*Hughes*"), *PPL EnergyPlus LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) ("*Solomon*") *cert. den.* 136 S. Ct. 1728 (2016), *La. Energy & Power Authority v. FERC*, 141 F.3d 364, 367 n.5 (D.C. Cir. 1998) (citing cases); *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017).

Similarly, in determining who may seek review of FERC orders in violation of the FPA, the Second Circuit has taken an extremely expansive view going as far as to hold that plaintiffs

16

pursuing *non-economic* interests may bring suit to enforce the FPA. *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 615-16 (2d Cir. 1965).

Each Plaintiff has been denied the opportunity to obtain contracts for its facilities on terms consistent with federal law. *See Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (denial of a benefit in the bargaining process can itself create an Article III injury.)  *See also, id.* ("The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement.   It follows logically that any petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies this part of the standing test") (internal citations and quotations omitted).

In *Clinton*, several groups challenged the constitutionality of the Line Item Veto Act.  One of the groups, a farmers cooperative, claimed that it was injured when the President canceled a tax benefit that would have aided it in obtaining certain processing facilities. *See id.* at 432.   That tax benefit was one of a number of benefits instituted by Congress in the Taxpayer Relief Act of 1997, but only one of two that the President vetoed. *Id.*   In defending the statute, the government argued that the cooperative had not shown that it would have actually obtained a facility on favorable terms. *Id.* at 433 n.22.   The court rejected this argument, citing *Northeastern Florida Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993) for the proposition that denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result. *Id.*   Here, the Defendants' improper implementation is canceling a benefit that would aid Plaintiffs in obtaining a contract for the sale of its energy from its facilities or facilities to be developed, aid in obtaining revenues that they are entitled to receive for the sale of electricity, and aid in the development of QFs.   That is precisely the same circumstance that

provided standing in *Clinton.*

In *Clinton*, the Supreme Court also concluded that the New York City Health and Hospitals Corp. ("NYCHHC") had standing to challenge the constitutionality of the Line Item Veto Act. NYCHHC challenged the President's cancellation of a provision that would have relieved NYCHHC of its contingent liability to the United States, which remained contingent because of a pending petition for a waiver of the liability. *See Clinton*, 524 U.S. at 422, 118 S. Ct. at 2095.  In rejecting the government's contention that NYCHHC's injury was too speculative because the liability might still be waived, the Court compared NYCHHC's injury to the setting aside of a favorable verdict and remanding for a new trial.  The Court stated: "Even if the outcome of the second trial is speculative, the reversal, like the President's cancellation, causes a significant immediate injury by depriving the defendant of the benefit of a favorable final judgment." *Id.* at 431, 118 S. Ct. at 2099.

So too here.  It would be a serious error to conclude that it is *implausible* that the decreased opportunities, increased competition and limited availability of contracts due to the Defendants' improper implementation would not have any adverse impact on Plaintiffs.  Here, Plaintiffs have suffered lost revenues, the increased likelihood of projects being not built, an increase risk of losses and the denial of the opportunity to participate in a process that complies with federal laws, which would aid in their developing QFs.   Further, just like the farmers cooperative in *Clinton*, the Defendants' unlawful regulatory actions have also substantially increased the potential for loss of eligibility for public conferred benefits, i.e., here Vermont standard offer contracts and PURPA benefits available to Plaintiffs and the opportunities that such benefits would create for Plaintiffs.

A ruling in Plaintiffs' favor, declaring the challenged regulatory actions void and unlawful, would redress those injuries by providing the Plaintiffs with the opportunity to participate in a

compliant process to obtain a contract under the Standard Offer program and would reverse the Defendants' cancelation of a benefit that would aid Plaintiffs in obtaining a contract for the sale of its energy from its facilities or facilities to be developed, aid in obtaining revenues that they are entitled to receive for the sale of electricity, and aid in the development of QFs.

Each Plaintiff has suffered an injury-in-fact because of the Defendants' unlawful actions. The Defendants' actions also adversely affect the Plaintiffs by increasing the risk of losses from solar development, reducing opportunities, and increasing the risk that its projects would never get built, thus losing the investment in the projects, or resulting in reduced revenue, in each case as the direct result of the Defendants' unlawful regulatory actions. This injury-in-fact would be caused by the Defendants' regulatory actions, and it would be redressed if the challenged regulatory actions were invalidated. This is classic economic harm that requires no prediction or speculation and is independently sufficient to establish standing. Those adverse market impacts on Plaintiffs are clearly redressable.

Those are also the same type of adverse market impacts that provided standing to generators to successfully challenge State regulatory actions in *Hughes, Solomon and Nazarian*. There is simply no basis for holding that Plaintiffs, as participants in the regional and local energy markets, have no particularized, concrete and imminent interest in the *plausible* adverse market effects of the Defendants' regulatory actions that deny Plaintiffs the opportunity to participate in a compliant process to obtain a contract under the Standard Offer program, increase the risk of losses from solar development, reduce opportunities, and increase the likelihood of projects never being built. Nor is there a basis to conclude that those effects would not likely be redressed by voiding and prohibiting the illegal conduct.

To establish standing, a plaintiff is not required to show a *guarantee* that the court's actions

would redress its injury; rather, it must simply show that "it is likely, as opposed to merely speculative, that the injury will be redressed." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

At the pleadings stage Plaintiffs are not required to provide evidentiary support for its predictions; rather, it is required merely to show that its claims are "plausible." *Ashcroft v. Iqbal,* 566 U.S. 622, 678 (2009). It is "plausible," to say the least, that the Plaintiffs would have increased likelihood of projects being built, a decrease in the risk of losses to Plaintiffs, an increase in the likelihood of participating in a compliant process to obtain a contract under the Standard Offer program, a decrease in the risk of losses from solar development, and increased opportunities if an order from this Court voids and prohibits the illegal conduct.

The Plaintiffs do not need to guarantee that their chances of obtaining contracts or higher revenue would increase if the regulatory actions were enjoined. The Supreme Court has repeatedly and squarely held that a plaintiff can establish standing based on the *predicted* behavior of executive officials, even if that behavior is not guaranteed. *See, Utah v. Evans*, 536 U.S. 452, 463-64 (2002); *FEC v. Akins*, 524 U.S. 11, 25 (1998). For present purposes, all that matters is that Plaintiffs' have put forth a *plausible* allegation that if unlawful regulatory actions are nullified, then the Plaintiffs would have decreased costs, increased likelihood of projects being built, a decrease in the risk of losses to Plaintiffs, an increased likelihood of the opportunity to participate in a compliant process to obtain a contract under the Standard Offer program, and increased opportunities. Further, just like the farmers cooperative in *Clinton*, the Defendants' unlawful regulatory actions substantially increase the potential for loss of eligibility for public conferred benefits, i.e., here Vermont standard offer contracts and PURPA benefits available to owners of

such solar facilities, that aid in the development of QFs.[8]

**IV.     Plaintiffs' Alleged Injuries Arising Out Of Existing Contracts Are Redressable.**

The FAC removes the requested relief that the Defendants be ordered to award contracts for Plaintiffs' projects submitted in the 2019 and 2020 standard offer procurements.  If the Court issues the relief requested by the Plaintiffs addressing the infirmities in the standard offer program that existed when the FERC Petition was filed, all of which still exist, then Plaintiffs will seek specific contracts in Vermont state court and a correction in the rate of existing contracts as an as-applied challenge.  That is the approach the federal courts took in *Winding Creek Solar LLC v. Peterman*, 932 F.3d 861, 865 (9th Cir. 2019).  In *Winding Creek*, after declaring that California's use of an auction mechanism with volume caps (as here) was unlawful, the federal courts directed the plaintiff to seek its contract remedies in state court as an as-applied challenge without any requirement for a prediction as to the plaintiff's ultimate success in that as-applied endeavor.

Here, the VPUC determined what the avoided cost rate was at all relevant times.  Thus, there is no guesswork or analysis needed to determine an avoided cost rate.  Plaintiffs have alleged that a ruling in Plaintiffs' favor declaring the restriction on a QSPP's entitlement to the VPUC LRAC Rate for energy from its QF will allow the Plaintiffs to go to Vermont state court under 16 U.S.C. §824a-3(g) to have the price in existing Standard Offer contracts adjusted upward to the proper VPUC LRAC Rate in effect at the time of the contract and to have contracts issued for the facilities that were denied contracts solely as a result of the unlawful features of Vermont's implementation of section 210 of PURPA.

Whether the Plaintiffs will succeed in that endeavor is also a merits issue, not a standing

---

[8] The Defendants' argument that the Plaintiffs' lack injury because there are other avenues to obtain contracts was expressly rejected by the Second Circuit.  *See, Allco Finance Ltd. v Klee*, 861 F.3d 82 (2d Cir. 2017), fn. 10.

issue.  Even if it were a standing issue, while there is no guarantee that Plaintiffs would be successful, the likelihood is sufficient enough for standing. *See Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) ("The Government argues that there can be an Article III injury only if [plaintiff] would have actually obtained a facility on favorable terms.  We have held, however, that a denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result."); *cf. Natural Resources Defense Council, Inc. v. FDA*, 710 F.3d 71, 81 (2d Cir. 2013) (plaintiff can establish injury-in-fact based on showing of increased risk of harm, even when harm is not guaranteed).  *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)) (under Article III, prospective bidders could establish an injury-in-fact "even though there was no showing that any party would have received a contract absent the ordinance."  *Clinton*, 524 U.S. at 433 n.22.)

Moreover, the United States Supreme Court has repeatedly and squarely held that a plaintiff can establish standing based on the *predicted* behavior of executive officials, even if that behavior is not guaranteed.  In *Utah v. Evans*, 536 U.S. 452 (2002) ("*Evans*"), the Supreme Court held that Utah had standing to challenge a census report, even though no executive official had any obligation to follow the terms of the new report.  *Id.* at 463-64.  The court found it "substantially likely" that the Executive Branch would abide by the new report, and thus held that the "practical consequence" of altering the report was "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered," even though there was no guarantee that the Executive Branch would take any action based on the court's ruling.  *Id.* at 464.  Similarly, in *FEC v. Akins*, 524 U.S. 11, 25 (1998), the Court found that a plaintiff had "standing to obtain court determination that the organization was a 'political committee' where that determination would make agency more likely to require reporting, despite [the] agency's

power not to order reporting regardless." *Evans*, 536 U.S. at 464 (describing *Akins*); *see also id.* (collecting other, similar cases). These cases show that as long as there is a sufficient possibility that the Plaintiffs might obtain relief after this Court's decision, the Plaintiffs can independently establish standing, even if there is a possibility that relief may be denied.

Here, Plaintiffs' complaint adequately alleges that it is likely that the Vermont state courts would intervene in an as-applied challenge under 16 U.S.C. §824a-3(g) based upon a favorable ruling from this Court in Plaintiffs' implementation challenge here. The VPUC determined avoided cost rate at all relevant times is known. Thus, the state court would not need to engage in any analysis to determine the rate that the Plaintiffs were entitled to. Plaintiffs' allegation establishes that it is at least *likely* that, if this Court issues the requested declaration, the state courts in an as-applied challenge would enforce the requirements of federal law that were in force at the relevant time and, in the case of existing contracts, adjust the rate upward to what the Plaintiffs were entitled to. *See*, *FERC v. Mississippi,* 456 U.S. 742, 760-761 (1982)

> state courts have a unique role in enforcing the body of federal law, and [state] courts had jurisdiction adequate and appropriate under established local law to adjudicate this action. . .. Thus the state courts were directed to heed the constitutional command that the policy of [PURPA] is the prevailing policy in every state, and should be respected accordingly in the courts of the State. . .. Any other conclusion would allow the States to disregard both the preeminent position held by federal law throughout the Nation and the congressional determination that the federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery.
>
> (internal citations and quotations omitted.)

Defendants' reliance on *Freehold Cogen. v. Board of Reg. Comm'rs of N.J.*, 44 F.3d 1178, 1194 (3rd Cir. 1995) is misplaced because in this case the state courts would be acting under Federal law—16 U.S.C. §824a-3(g)—and not state law. Defendant's reliance on *Independent Energy Prod. Ass'n, Inc. v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 858 (9th Cir. 1994) is also

misplaced for the same reason.  Plaintiff would not be seeking an adjustment based upon subsequent prices for fuel.  Rather Plaintiffs would seek the rate that they were entitled to at the time, which was the then avoided cost rate determined by the VPUC.  The Defendants' reliance on *Smith Cogen. Mgt., Inc. v. Corp. Comm'n*, 863 P.2d 1227, 1242 (Okla. 1993) is misplaced for the same reason.  There the Oklahoma commission rules were a state rule that sought to displace what a QF would be entitled to under federal law.  Here, Plaintiffs only seek what they were entitled to under federal law at the relevant time.

*New York State Elec. & Gas Corp. v. Saranac Power Partners L.P.*, 117 F. Supp. 2d 211, 252 (N.D.N.Y. 2000), *aff'd*, 267 F.3d 128 (2d Cir. 2001) is inapposite for the same reason.  There, the plaintiff's contract required it to pay for energy purchased from two QFs at a fixed rate equal to its estimated long-run avoided costs as calculated at the beginning of the contract.  The utility sought to unwind the rate because years later its then future forecasted LRAC rate was lower.  In *Saranac Power*, the utility "demanded that FERC issue a declaratory order finding that PURPA and its accompanying regulations prohibit purchase rates in NYSEG's congressionally mandated PPAs that are in excess of its avoided costs even if such rates were not so excessive at the time the contracts were signed." *Id*. at 220.  That is not this case.  Plaintiffs only seek what they were entitled to under federal law at the relevant time.   In any case, it certainly seems odd for the State's Attorney General to be arguing that it is highly speculative that its State's courts would enforce the law in effect at the time Plaintiffs.

Under the Defendants' view, the California District Court and the Ninth Circuit simply got it wrong.  *Winding Creek Solar LLC v. Peterman*, 932 F.3d 861, 865 (9th Cir. 2019).  After declaring California's implementation of PURPA unlawful, those courts directed the plaintiff to seek a contract remedy in state court.  But under the Defendants' arguments here, the ability to get

a remedy in state court is speculative so those Federal courts should have dismissed the case at the get-go. Rightfully, those Federal courts did not adopt the Defendants' line of thinking and neither should this Court.

**CONCLUSION**

Plaintiffs seek only what the law entitles them to receive, i.e., the rate determined by the Defendants as the ratepayer neutral avoided cost rate over the 25-year term used by the Defendants, and without competition. That is what PURPA provides. That is also what the Vermont Legislature mandated if the reverse auction was not consistent with PURPA. Only the Defendants seek a different result than mandated by both Congress and the Vermont Legislature.

For the above reasons, this Court should not dismiss the FAC. If the Court does dismiss the FAC, the Plaintiffs request leave to further amend the complaint.

Dated: March 30, 2021

*/s/ Thomas Melone*
Thomas Melone
Allco Renewable Energy Limited
157 Church St., 15th floor
New Haven, CT 06510
(212) 681-1120
Thomas.Melone@AllcoUS.com
*Attorney for Plaintiff*